## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| IZAAK WALTON LEAGUE OF AMERICA, INC.; WILDERNESS WATCH; SIERRA CLUB NORTHSTAR CHAPTER; and NORTHEASTERN MINNESOTANS FOR WILDERNESS, | Civil No. 06-3357 (JRT/RLE) |
| Plaintiffs, | |
| v. | |
| ABIGAIL KIMBELL, Chief of the United States Forest Service, and MIKE JOHANNS, Secretary of Agriculture, | **MEMORANDUM OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |
| Defendants, | |
| and | |
| COOK COUNTY, CONSERVATIONISTS WITH COMMON SENSE, and ARROWHEAD COALITION FOR MULTIPLE USE, | |
| Intervenors. | |

Kristen M. Gast, Brian B. O'Neill, Richard A. Duncan, and Jonathan W. Dettmann, **FAEGRE & BENSON LLP**, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-3901, for plaintiffs.

Patricia R. Cangemi, Assistant United States Attorney, **OFFICE OF THE UNITED STATES ATTORNEY**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for defendants.

David R. Oberstar, **FRYBERGER, BUCHANAN, SMITH & FREDERICK, PA**, 700 Lonsdale Building, 302 West Superior Street, Duluth, MN 55802, for intervenors.

Plaintiffs challenge a decision of the United States Forest Service ("Forest Service" or "USFS") to construct a snowmobile trail connecting McFarland Lake to South Fowl Lake along a route that is adjacent to the Boundary Waters Canoe Area Wilderness ("BWCAW") in northeastern Minnesota.  Plaintiffs further challenge the Forest Service's failure to set motorboat quotas for South and North Fowl Lakes.  Plaintiffs argue that the Forest Service's actions violate the Wilderness Act, the BWCAW Act, the National Forest Management Act, the National Environmental Policy Act, and the Administrative Procedure Act.  This matter is before the Court on the parties' cross-motions for summary judgment.  For the reasons discussed below, the Court grants in part and denies in part the motions for summary judgment.

## BACKGROUND

South and North Fowl Lakes are the eastern-most lakes in a chain of lakes along the border between northeast Minnesota and Canada.  In 2003, the Forest Service identified an unlawful snowmobile route, known locally as the Tilbury Trail, located in the Superior National Forest.  The Tilbury Trail connected McFarland Lake in the west to South Fowl Lake in the east.  Because the trail encroached on Royal Lake and Royal River, located inside the Boundary Waters wilderness area along the northern edge of the trail, the Forest Service decided to close the Tilbury Trail.  Following closure of the trail, the only available motorized access route to South Fowl Lake was Cook County Road 16.  Snowmobilers wishing to access South Fowl Lake thus had to share a steep and potentially dangerous road with cars and trucks.  Because the Forest Service wished to

develop a safe alternative route that would provide public snowmobile access to the South Fowl Lake, the Forest Service proposed construction of the South Fowl Snowmobile Trail (the "South Fowl Trail"), connecting McFarland Lake to South Fowl Lake along the same general route as the Tilbury Trail.

In the summer of 2003, the Forest Service began public discussions and field research on the proposed trail, culminating in a draft proposal for the South Fowl Trail that identified several alternative snowmobile routes.   In November 2005, the Forest Service released an environmental assessment ("EA") for the proposed South Fowl Trail. The EA identified four action alternatives and one no-action alternative.  The four action alternatives proposed different trail routes between McFarland Lake and South Fowl Lake, three of which involved trails along existing roadways not closer than one-half mile from the BWCAW boundary at Royal Lake.  The Alternative 2 route was the northern-most route of the proposed alternatives.  The trail proposed in Alternative 2 would involve the construction of 2.2 miles of new snowmobile trail.  A segment of the trail would ascend to a bench along a steep ridge that is immediately adjacent to designated wilderness area, overlooking both Royal River and Royal Lake.

The EA considered the potential impact of each of the proposed alternatives on the surrounding area, including the impact on sensitive flora, the cumulative effects resulting from the construction of a new snowmobile trail, and the visual and sound impacts caused by snowmobile traffic.  The EA determined that the potential impact of the Alternative 2 trail on sensitive flora was not significant, based on an analysis of potential impacts to 85 sensitive species contained in the accompanying Biological Evaluation

("BE").   The EA also analyzed potential cumulative effects of off-highway and off-season recreational use, as well as the potential for increased snowmobile traffic as a result of the new trail.   The EA recognized the possibility of increased illegal recreational use resulting from the construction of a new snowmobile trail.  However, the EA noted that the project area is not a popular destination for off-highway vehicles, and that the Alternative 2 trail route was unlikely to result in additional incursions into adjoining wilderness because of the steep terrain separating the trail from the wilderness. The EA also evaluated the effectiveness of mitigation measures that would be employed to reduce off-highway and off-season recreational use.

Finally, the EA considered the potential visual and sound impact caused by each proposed trail.  The EA found that the sound of snowmobile traffic from Alternative 2 would carry directly into the adjoining wilderness, and that intervening deciduous trees would do little to reduce the sound.  While noting that sound measurements could be calculated at various locations within the wilderness, the EA stated that "such detailed data appears to be moot."  (Admin. Rec. 157.)  Thus, because wilderness visitors would consider any sight or sound from snowmobiles to be negative, the EA dispensed with any quantitative measurements of the sound impact in the wilderness.

Based on the analysis set forth in the EA, the Forest Service issued a Decision Notice and Finding of No Significant Impact ("DN/FONSI") on February 21, 2006, approving selection of Alternative 2 for the South Fowl Trail.   The Forest Service determined that a more complete analysis of the environmental effects in an Environmental Impact Statement ("EIS") was unnecessary because construction of the

South Fowl Trail along the Alternative 2 route was not a "major Federal action[] significantly affecting the quality of the human environment" under the National Environmental Policy Act ("NEPA"). 42 U.S.C. § 4332(2)(C). Regarding sound impact, the FONSI stated that the decibel level of a snowmobile in the adjoining wilderness, at a distance of 600-800 feet from the proposed route, would be approximately 49 decibels. The FONSI concluded that this decibel level was not significant.

Several environmental groups appealed the DN/FONSI. On May 18, 2006, a Forest Service Appeal Reviewing Officer recommended that the selection of Alternative 2 as set forth in the DN/FONSI be affirmed, and the Forest Supervisor subsequently adopted the recommendation.

Plaintiffs filed this lawsuit on August 17, 2006. Count I of the Complaint alleges that the proposed Forest Service action violates the Wilderness Act and the BWCAW Act because the South Fowl Trail would deposit riders at the South Fowl Lake, which plaintiffs contend is located within the wilderness area. Count II alleges that the Forest Service has failed to implement motorboat quotas on North and South Fowl Lakes in violation of § 4(f) of the BWCAW Act. Count III alleges that the South Fowl Trail will project the sights and sounds of snowmobiles into the wilderness area in violation of § 4(b) of the Wilderness Act. Count IV alleges that the South Fowl trail will harm threatened species and increase the cumulative amount of trails in violation of the National Forest Management Act. Finally, Count V alleges that the Forest Service violated NEPA by failing to prepare an EIS for the proposed trail. Plaintiffs, defendants, and intervenors filed cross-motions for summary judgment on each of plaintiffs' claims.

**ANALYSIS**

## I.    THE ADMINISTRATIVE PROCEDURE ACT

The Court's review of agency decisions is limited by the Administrative Procedure Act ("APA").  Plaintiffs bring this action under §§ 706(2)(A) and 706(1) of the APA. Section 706(2)(A) requires courts to overturn an agency decision that is arbitrary, capricious, an abuse of discretion, or contrary to law. 5 U.S.C. § 706(2)(A).   The reviewing court may not substitute its judgment for that of the agency, as long as the agency's determination is supported by any rational basis.  Section 706(1) provides that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706.  Agencies must be compelled to act where the agency fails to carry out a mandatory, nondiscretionary duty.   *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187-88 (10th Cir. 1999).

## II.    THE BWCAW ACT AND THE WILDERNESS ACT (Counts I and II)

Plaintiffs contend that the South Fowl Trail will deposit snowmobile riders in designated wilderness area in violation of the BWCAW Act and the Wilderness Act. Plaintiffs also argue that the Forest Service has failed to implement motorboat quotas on the Fowl Lakes in violation of § 4(f) of the BWCAW Act.  Neither side disputes that snowmobiles are banned within the BWCAW, with limited exceptions not including the Fowl Lakes.  Under § 4(e) of the BWCAW Act, "[t]he use of snowmobiles in the

wilderness designated by this Act is not permitted." Pub. L. No. 95-495, § 4(e). Section 4(e) goes on to list several exceptions to the general snowmobile ban, but does not include the Fowl Lakes. Similarly, the Wilderness Act provides that "there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats" within wilderness areas. 16 U.S.C. § 1133(c). Nor do the parties dispute that the BWCAW Act imposes motorboat quotas on lakes located wholly or partly within the wilderness area. Section 4(f) directs the Secretary of Agriculture to "develop and implement, as soon as practical, entry point quotas for use of motorboats within *the wilderness portions* of the lakes listed in [§ 4(c)]." Pub. L. No. 95-495, § 4(f) (emphasis added).

Plaintiffs' claims assume that the Fowl Lakes are located inside the BWCAW area. As determined by this Court in its separate Memorandum Opinion, however, the Fowl Lakes are not located inside the wilderness area. Instead, the plain language of the BWCAW Act and the subsequently published Forest Service map demonstrate that the Fowl Lakes are excluded from the BWCAW. Because the Fowl Lakes are excluded from the BWCAW, the snowmobile ban and motorboat quotas set forth in the BWCAW Act and the Wilderness Act are inapplicable to the Fowl Lakes.[1] As such, the Court cannot conclude that the Forest Service's decision to construct a trail to South Fowl Lake is

---

[1] Defendants and intervenors also contend that plaintiffs failed to exhaust their administrative remedies because they did not assert the motorboat quotas claim in the administrative proceedings. However, "where the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review." *Darby v. Cisneros*, 509 U.S. 137, 154 (1993). Nor is plaintiffs' claim time-barred by the six-year statute of limitations under 28 U.S.C. § 2401(a), to the extent plaintiffs argue that the USFS's failure to implement motorboat quotas is a continuing violation. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).

arbitrary or capricious on this ground.  Further, the Court finds that the Forest Service has no nondiscretionary duty to impose motorboat quotas on the Fowl Lakes such that its failure to do so is action unlawfully withheld or unreasonably delayed under § 706(1) of the APA.  The Court therefore grants summary judgment to defendants on Counts I and II of the Complaint, and denies summary judgment to plaintiffs on these same Counts.

## III.    SECTION 4(b) OF THE WILDERNESS ACT (Count III)

Plaintiffs next argue that the South Fowl Tr ail will project the sights and sounds of snowmobiles into the BWCAW around Royal Lake and Royal River.  As such, plaintiffs contend that the decision to construct the South Fowl Trail violates the plain language of the Wilderness Act.  Defendants respond  that no violation of the Wilderness Act occurs because the agency action in question takes place in adjacent non-wilderness areas.

Section 4(b) of the Wilderness Act provides as follows:

> Except as otherwise provided in this chapter, each agency administering any area designated as wilderness *shall be responsible for preserving the wilderness character of the area* and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character.

16 U.S.C. § 1133(b) (emphasis added).   Section 4(c) of the Wilderness Act then proscribes specific activities within wilderness areas, providing that

> except as necessary to meet minimum requirements for the administration of the area . . . , there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

16 U.S.C. § 1133(c).  Plaintiffs argue that the plain language of § 4(b) does not distinguish among impacts to the wilderness based on the source or location of the degrading activity.[2]  Defendants counter that such an interpretation would create a judicial "buffer zone" around any wilderness area, effectively expanding the wilderness beyond the areas designated by Congress.  Such an interpretation, defendants argue, has no case law support and would have no limiting principle.

In support of their argument, plaintiffs point to the recent decision in *Greater Yellowstone Coalition v. Timchak*, 2006 WL 3389731 (D. Idaho Nov. 21, 2006). *Timchack* addressed whether the Forest Service's decision to grant a helicopter permit to a heli-skiing company violated the Wyoming Wilderness Act, which requires the Forest Service to administer the Palisades Wilderness Study Area ("WSA") "so as to maintain [its] presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System." *Id.* at *2; Pub. L. No. 98-550, § 301(c).  Rejecting the Forest Service's argument that loud helicopter flights over the WSA were permissible so long as other opportunities for solitude remained available in the WSA,[3] the court noted that the Wyoming Wilderness Act "abides no diminishment" of opportunities for solitude

---

[2] Plaintiffs also cite Forest Service regulations requiring the agency to accord overriding priority to wilderness values under 36 C.F.R. § 293.2(c), arguing that the agency's failure to do so in this case is arbitrary and capricious.  The Court finds that these regulations do not distinguish between agency action inside and outside the wilderness.  Whether the agency action in this case is arbitrary and capricious will likely depend on whether its action violates the Wilderness Act, as discussed below.

[3] The Forest Service's Final Environmental Impact Statement created and applied a standard that examined "whether opportunities for solitude are readily available throughout most of the WSA most of the time." *Id.* at *5.

and primitive recreation in the Palisades WSA, and held that the decision was arbitrary and capricious. *Timchak*, 2006 WL 3386731, at *6-7. Plaintiffs seize on this language, arguing that the Wilderness Act similarly abides no diminishment of its wilderness character. Unlike the Wilderness Act, however, the Wyoming Wilderness Act directs the Forest Service to "administer the Palisades WSA to maintain the opportunities for solitude or primitive and confined recreation *that existed there in 1984*." *Id.* at *3 (emphasis added). Thus, the Forest Service's decision to issue a helicopter permit without comparing the effects of increased use with the wilderness conditions that existed in 1984 violated a more specific statutory command than the one at issue in this case. As such, even if *Timchak* were binding on this Court, it cannot plausibly be read to support plaintiff's argument that *any* effect on the wilderness from adjoining non-wilderness areas is banned under § 4(b) of the Wilderness Act.

However, defendants' argument that courts have upheld agency activities impacting adjoining wilderness areas is similarly unavailing. Defendants cite *Sierra Club Northstar Chapter v. Bosworth*, 428 F. Supp. 2d 942, 951 (D. Minn. 2006) ("*Sierra Club Tomahawk*"), in which this Court determined that a USFS timber-harvesting project did not require an EIS, even though the harvest would impact adjoining wilderness areas. Defendants argue that agency activity that impacts adjoining wilderness is permissible so long as the agency activity takes place outside the wilderness boundaries. However, the plaintiffs in *Sierra Club Tomahawk* challenged the agency activity under NEPA, and not under § 4(b) of the Wilderness Act. Indeed, whether the Wilderness Act encompasses

agency activity that takes place on land adjoining a wilderness area appears to be an issue of first impression in this circuit.

The Court finds that the plain language of § 4(b) makes no distinction based on the source of the allegedly degrading agency activity. Rather, § 4(b) mandates that any agency administering the wilderness area "shall be responsible for preserving the wilderness character of the area." 16 U.S.C. § 1133(b). The text of § 4(b) indicates that the agency's duty to preserve the wilderness is wholly independent of the source or location of that activity. Moreover, Congress has demonstrated its ability to draw statutory distinctions between agency activities that take place inside and outside the wilderness boundaries. For example, § 7 of the Arkansas Wilderness Act states "Congress does not intend that designation of protective perimeters or buffer zones around each wilderness area. The fact that non-wilderness activities or uses can be seen or heard from areas within the wilderness shall not, of itself, preclude such activities or uses up to the boundary of the wilderness area." Pub. L. No. 98-508, § 7; *see also Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 810 (8th Cir. 1998) (noting that if the Forest Service "prohibited an activity outside a wilderness area solely because of its potential effect on the Wilderness area, that prohibition would violate Section 7"). The Washington State Wilderness Act of 1984 similarly prohibits the creation of protective perimeters or buffer zones around the wilderness area. Pub. L. No. 98-339, § 9. These wilderness statutes demonstrate that Congress knows how to exclude buffer zones when it so chooses, and that it has chosen not to exclude such buffer zones under the Wilderness Act. While these statutes do not evince a clear legislative intent to exclude

buffer zones under § 4(b) of the Wilderness Act, they corroborate the Court's interpretation of the plain language of § 4(b). For these reasons, the Court holds that an agency's duty to preserve the wilderness character under § 4(b) of the Wilderness Act may apply to agency activity that occurs outside of the boundaries of the wilderness area.

Having so decided, the Court must determine whether § 4(b) has been violated in this case. Neither side has put forth a proposed standard or limiting principle by which to analyze violations of § 4(b). Plaintiffs insist that agency activity that results in *any* impact on the adjoining wilderness violates the agency's duty to preserve the wilderness character of the area. The Court is not persuaded that § 4(b) supports a *per se* ban on agency activity that has any impact on the adjoining wilderness. First, § 4(b) requires the agency to preserve a designated area's "wilderness character." As such, the agency must ensure that its actions to not degrade or alter those essential, natural characteristics that endow an area with its wilderness character. The plain language of § 4(b) does not proscribe any agency activity with a possible effect on the adjoining wilderness, however. Second, just as certain wilderness statutes demonstrate Congress's ability to exclude buffer zones when it chooses, the Wyoming Wilderness Act suggests that Congress knows how to create a more specific statutory command to forbid any impact on wilderness. *See Timchak*, 2006 WL 3386731, at *6-7 (finding that the Wyoming Wilderness Act "abides no diminishment" of opportunities for solitude and primitive recreation). Finally, the Court agrees with defendants that a *per se* ban on all agency activity having some impact on the adjoining the wilderness area would substantially impede its administration of wilderness areas, and could serve to expand the wilderness

boundaries beyond the area established by Congress.  An agency's duty under § 4(b) must take into account the fact that, at some point, the wilderness stops and civilization begins.

Thus, the key question in determining whether agency action violates § 4(b) is whether that action degrades the wilderness character of a designated wilderness area.  To answer this question, the Court must look to various factors including the nature of the agency activity, the existing character of the wilderness area, and the extent to which the essential, natural characteristics of the wilderness area are changed by the agency activity in question.  For example, if the wilderness area is affected by sounds caused by recreationalists on private property adjacent to the wilderness, agency activity that affects that same wilderness area with sound that is similar in volume, duration, frequency, and quality, is unlikely to result in a violation of the § 4(b).  In other words, where the agency activity does not increase or exacerbate the existing sound impact on the wilderness area, such activity would not degrade the wilderness character of the area.  On the other hand, agency activity that results in noise that is louder, more constant, more frequent, or of a different quality, is more likely to degrade the wilderness character from its present condition and thus violate § 4(b).

To assess these factors, the Court must look to the agency's factual findings as detailed in the administrative record pursuant to the agency's statutory duties under NEPA.  Because the Court determines that the Forest Service's analysis of the sound impact on the adjoining wilderness requires preparation of an Environmental Impact

Statement, as discussed below, the Court denies without prejudice plaintiffs' and defendants' motions for summary judgment on this claim.[4]

## IV.    NATIONAL FOREST MANAGEMENT ACT (Count IV)

Plaintiffs challenge the Forest Service's decision to construct the South Fowl Trail as a violation of the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*  Specifically, plaintiffs argue that construction of the South Fowl Trail will violate specific standards and guidelines developed under the Superior National Forest Plan pursuant to the NFMA.  The NFMA requires that the Secretary of Agriculture develop and maintain land and resource management plans for each national forest, including the Superior National Forest.  16 U.S.C. § 1604(a); 36 C.F.R. § 219.7 (setting forth agency criteria for developing, amending, and revising forest plans).

Under 16 U.S.C. § 1604(g)(3), the Forest Service is directed to specify guidelines for these land management plans to meet the various and sometimes competing goals of the Forest Service in developing and managing the national forests.  Among these goals, the Forest Service guidelines are to "insure consideration of the economic and environmental aspects of various systems of renewable resource management," and to "provide for diversity of plant and animal communities" within the national forests.  16 U.S.C. § 1604(g)(3)(A), (B).     In addition, federal agencies, including the Forest

---

[4] The Court anticipates that plaintiffs will again file a Wilderness Act claim upon the Forest Service's completion of an EIS regarding the sound impact of the South Fowl Trail, and that the parties will file subsequent motions in accordance with this Memorandum Opinion and Order.

Service, must facilitate the conservation of threatened and endangered species listed under the Endangered Species Act ("ESA").   16 U.S.C. § 1531(c)(1).   Land management plans must therefore include various provisions to ensure the conservation of such species, consistent with the limits of agency authority and the overall multiple use objectives of the plan.   36 C.F.R. § 219.10(b)(2).

The Canada lynx is listed as a threatened species under the ESA.   50 C.F.R. § 17.11.       Consistent with the statutory and regulatory framework described above, the Superior National Forest Plan sets forth specific guidelines and standards[5] to promote conservation of the Canada lynx within the Superior National Forest.[6]   Forest Plan standard S-WL-2 prohibits a "net increase in groomed or designated over-the-snow trail routes unless the designation effectively consolidates use and improves lynx habitat through a net reduction of compacted snow areas."   (Forest Plan 2-30, Ex. K to Gast Aff., at K.3.)   Forest Plan guideline G-WL-6 directs the Forest Service, in designating trails for snow-compacting activities within lynx analysis units, to "move recreational use away from more sensitive, or better quality lynx habitat," and to "concentrate use within existing developed areas."   (*Id.*)

_____

[5] The Forest Plan defines guidelines as "preferable limits to management actions that may be followed to achieve desired conditions" and that are "generally expected to be carried out." (Forest Plan 1-8, Ex. K to Gast Aff., at K.3.)   Standards are defined as "required limits to activites." (*Id.*)

[6] The Canada lynx's long hind legs and large feet give it a competitive advantage in deep snow.  Human activities that compact snow, such as snowmobiling and snowshoeing, thus pose a risk to the Canada lynx by minimizing its competitive advantage over other predators.  (Canada Lynx Conservation Assessment and Strategy ("LCAS"), Ex. L to Gast Aff., at L1.)

Plaintiffs argue that the Forest Service's decision to construct the South Fowl Trail conflicts with standard S-WL-2 and is therefore arbitrary and capricious under 5 U.S.C. § 706(2)(A). Specifically, plaintiffs contend that the South Fowl Trail will result in a net increase of 2.2 miles of new snow-compacted trail in the Superior National Forest. Defendants counter that the South Fowl Trail creates no net increase in snow-compacted trail because the closure of the Tilbury Trail offsets the 2.2 miles of new trail. Defendants note that the Forest Service will place rocks, stumps, and natural debris in the Tilbury Trail to prevent future use of the trail. According to defendants, the Forest Service may therefore apply unauthorized "user-developed trails" to offset new trail construction under the "no net increase" standard of S-WL-2.

The Court cannot conclude that the Forest Service's interpretation of S-WL-2 is arbitrary and capricious. Because the "no net increase" standard is a creature of the Forest Service's own regulations, as promulgated in the Forest Plan, the Court affords considerable deference to its interpretation of the S-WL-2 standard. *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Native Ecosystem Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir. 2002) (noting the agency's particular expertise in interpreting its own Forest Plan). Here, the Forest Service has interpreted "groomed or designated over-the-snow trail routes" under S-WL-2 to include unauthorized user-developed trails such as the Tilbury Trail. The agency's interpretation is based on a determination that any snow-compacted routes, whether authorized or unauthorized, adversely impact the Canada lynx by minimizing its competitive advantage relative to other predators. Indeed, the Forest Service could reasonably conclude that, from the Canada lynx's perspective, the illegality

of the trail is irrelevant.  As such, the physical closure and obliteration of the Tilbury Trail could reasonably be used to offset the increase in snow-compacted trail created by the South Fowl Trail.[7]

Plaintiffs further contend that the Forest Service's explication of S-WL-2 is a post-hoc rationalization that has resulted solely from this litigation.  In determining whether agency action is arbitrary and capricious, courts must consider only the regulatory rationale offered by the agency at the time of its decision, and not the post-hoc rationalizations of its lawyers.  *Grand Canyon Air Tour Coalition v. FAA*, 154 F.3d 455, 469 (D.C. Cir. 1998).  The Court finds that the Forest Service explained in the FONSI its calculations of the net trail increase, and noted that its application of S-WL-2 was made clear in the Biological Assessment.  (Admin. Rec. at 80, 308-09.)  As such, the Forest Service adequately explained its rationale at the time it selected the Alternative 2 route for the South Fowl Trail.  For these reasons, the Court concludes that the agency's determination that the South Fowl Trail will not cause a net increase under standard S-WL-2 is not arbitrary and capricious.

Plaintiffs also challenge the Forest Service's application of guideline G-WL-6, which directs the Forest Service to minimize the impact of new snow-compacting routes in lynx analysis units by concentrating such routes in existing developed areas rather than

---

[7] The Court notes that the Forest Service's decision complies with the "no net increase" standard only to the extent that the Tilbury Trail is no longer a snow-compacted route after closure.  Thus, the Forest Service must take measures to ensure that the illegal trail is totally inaccessible to snow-compacting activities, such as by blocking and obliterating the trail with rocks, stumps, and other natural debris.

developing new recreational areas.  Plaintiffs argue that the South Fowl Trail violates G-WL-6 because it is outside the periphery of existing, legally developed roads and trails and runs for a length along the boundary of the BWCAW.  However, G-WL-6 does not require that new trails be located entirely within existing developed areas of the national forest, but rather gives the Forest Service considerable discretion in determining how best to protect or improve the lynx habitat and minimize snow compacting.  Further, while a portion of the South Fowl Trail is located within undeveloped forest along the BWCAW, the Court finds that much of the South Fowl Trail is concentrated in developed areas with existing roads and trails.  Given the discretionary nature of G-WL-6, the Court cannot conclude that the Forest Service's decision is arbitrary and capricious.

For these reasons, the Court grants defendants' motion for summary judgment, and denies plaintiffs' motion for summary judgment, with respect to Count IV of plaintiffs' Complaint.

## V.    NEPA (Count V)

Plaintiffs also challenge the Forest Service's determination that the decision to construct the South Fowl Trail does not necessitate an Environmental Impact Statement ("EIS").  The National Environmental Policy Act, or NEPA, requires that federal agencies prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  The purpose of NEPA is "to ensure that government agencies act on full information and that interested groups have access to such information." *Sierra Club v. United States Forest Service*, 46 F.3d 835, 837 n.2

(8th Cir.1995).    Thus, NEPA imposes procedural requirements, and not substantive outcomes, on agencies such as the Forest Service.    *Id.*; *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989) ("NEPA does not work by mandating that agencies achieve particular substantive environmental results.").    Courts must generally defer to agency conclusions that are fully informed and well-considered.    *Anderson v. Evans*, 371 F.3d 475, 486-87 (9th Cir. 2004).

To determine if an EIS is necessary, an agency may prepare an Environmental Assessment ("EA") to assist it in determining whether the impacts of a proposed project rise to the level of a major federal action. 40 C.F.R. §§ 1501.4, 1501.9; *see also Friends of the Bow v. Thompson*, 124 F.3d 1210, 1213-14 (10th Cir. 1997).    An EA is a concise public document that briefly discusses the relevant issues and either concludes that preparation of an EIS is necessary or concludes with a finding of no significant impact ("FONSI"), in which case preparation of an EIS is unnecessary.    *Earth Protector, Inc. v. Jacobs*, 993 F. Supp. 701, 704 (D. Minn. 1998); 40 C.F.R. § 1508.9.    The EA should provide sufficient evidence and analysis for making that determination. 40 C.F.R. § 1508.9(a)(1).    It must also include brief discussions of the need for the proposal, of alternatives, and of the environmental impacts of the proposed action and the alternatives. 40 C.F.R. § 1508.9(b).

To determine whether an agency action "significantly" affects the quality of the human environment under NEPA, an agency must consider the context of the action, including the affected region, the affected interests, and the locality of the area affected. 40 C.F.R. § 1508.27(a).    The significance of an agency action will vary with the setting

of the proposed action.  40 C.F.R. § 1508.27(a).  The EA must also evaluate the severity of the impact resulting from the agency action.  Among other considerations, the EA must evaluate the degree to which effects on the quality of the environment are likely to be highly controversial; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment.  40 C.F.R. §§ 1508.27(b)(4), (7), (10).  "When the determination that a significant impact will or will not result from the proposed action is a close call, an EIS should be prepared." *Nat'l Audubon Soc'y. v. Hoffman*, 132 F.3d 7, 13 (2d Cir. 1997).

Plaintiffs advance three arguments in support of their claim that the Forest Service's decision to issue a FONSI for the South Fowl Trail violates NEPA.  First, plaintiffs argue that the Forest Service failed to assess the impact of invasive plant species in the newly opened corridor.  Second, plaintiffs allege that the EA does not adequately assess the cumulative impacts of the South Fowl Trail, in particular the likelihood of off-season and off-trail illegal use and the impact of a "loop" route created by the new trail.  Finally, plaintiffs argue that the Forest Service failed to sufficiently analyze the noise impact caused by snowmobile use on the wilderness area.  Defendants respond that the Forest Service complied with NEPA by adequately considering and assessing in the EA each of the three potential impacts cited by plaintiffs above.

**A.      Impact on Sensitive Species**

Plaintiffs contend that the EA failed to analyze the risks posed by the Alternative 2 trail route to sensitive flora.  According to plaintiffs, the South Fowl Trail will maximize the likelihood of invasive species spread because it will be constructed in a new corridor. Defendants argue that the EA does in fact consider the potential impact of each of the proposed Alternatives on sensitive flora.  (Admin. Rec. 140-43.)  The Court agrees that the EA sufficiently considers the potential impact on sensitive flora caused by the construction of the South Fowl Trail.  In particular, the Court notes that the Forest Service prepared and relied on an exhaustive list of potential impacts to 85 sensitive species in the Biological Evaluation ("BE"), including an analysis of the direct and indirect effects on each of the sensitive species.  (Admin. Rec. 218-245.)  The BE found that three sensitive plant species[8] were known to occur in the corridor proposed in Alternative 2, and documented the effects that trail construction will likely have on these species.   The EA incorporated this "species assessment matrix" and analyzed the potential impact of each Alternative route on the sensitive species, finding that the three sensitive species impacted by Alternative 2 "could be affected by recreation, non-native invasives, small population problems, climate change, and possibly collecting."   (Admin. Rec. 139-142.)  However, the EA noted that the sensitive species are located on the north side of the cliffs between McFarland and South Fowl Lakes or in the Royal River drainage area, and that the chances for noxious weed spread are low.  The EA also noted

_____

[8] These three species are the Maidenhair Spleenwort, the Large-leaved sandwort, and Encrusted Saxifrage.  (Admin. Rec. 282, 295, 299.)

mitigation efforts to reduce the impact on sensitive species, including off-season trail closure, a relatively narrow width of the trail corridor, and minimal use of heavy equipment for trail construction.

The Court finds that the Forest Service provided sufficient evidence and analysis under NEPA and its implementing regulations to conclude that the potential impact caused by the Alternative 2 trail on sensitive flora is not significant. As such, the agency's decision to issue a FONSI on this basis is not arbitrary and capricious.

### B.    Cumulative Effects

Plaintiffs next argue that the EA does not adequately assess the cumulative effects of the South Fowl Trail. *See* 40 C.F.R. § 1508.27(b)(7). In particular, plaintiffs cite the likelihood of illegal off-season and off-trail use, as well as the potential for increased trail use resulting from a "loop" route created by the completion of the South Fowl Trail. According to plaintiffs, the Forest Service's determination that these cumulative effects will not be significant amounts to conclusory assurances with no supporting analysis or discussion. *See Sierra Club v. Bosworth*, 352 F. Supp. 2d 909, 927 (D. Minn. 2005) ("*Sierra Club Big Grass*") (noting that the analysis of cumulative impacts in an EA must disclose "a reasonably thorough discussion of the significant aspects of the probable environmental consequences"). Defendants respond that the analysis of cumulative effects contained in the EA is adequate to support the FONSI. Defendants emphasize that an EA is a "concise public document" that should "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact

statement or a finding of no significant impact."[9]   40 C.F.R. § 1508.9; *see Sierra Club v. United States Forest Service*, 46 F.3d 835, 840 (8th Cir. 1995) ("An EA cannot be both concise and brief and provide detailed answers for every question.").

The Court finds that the EA contains sufficient analysis of the cumulative effects to support the Forest Service's FONSI.  The EA analyzed the potential for "off highway vehicle" ("OHV") impact for each of the alternative trail routes.  (Admin. Rec. 149-151.) The EA noted that the project area is not a frequent OHV destination, and that the Alternative 2 trail route was unlikely to lead to additional incursions into the adjoining wilderness because of the steep terrain separating the trail from the wilderness.  The EA further noted that "in general, illegal cross-country travel by OHV is difficult because of thick vegetation, brush and windfalls."   (Admin. Rec. 149.)   Nonetheless, the EA recognized that the construction of any new trail entailed a risk of increased illegal OHV use, and set forth specific mitigation measures designed to reduce the potential for illegal off-trail and off-season incursions.  (Admin. Rec. 128.)   In particular, the EA noted that "[i]f motorized vehicles such as ATVs and motorcycles cannot be successfully controlled, the Forest Service has the option of closing the trail and restoring the area." (Admin. Rec. 128.)   *Cf. Sierra Club Big Grass*, 352 F. Supp. 2d at 924 (finding Forest Service's analysis of cumulative effects inadequate because it contained "little to no

---

[9] Plaintiffs, quoting *Sierra Club Big Grass*, argue that an agency may prepare an EA "only in those obvious circumstances where no effect on the environment is possible."   352 F. Supp. 2d at 923.  However, the Court went on to state that under NEPA and its implementing regulations, an EIS is required not where an effect on the environment is merely possible, but where the effect is significant.  *Id.*

analysis of any illegal use of 'closed' roads in the project").  The EA also adequately considered the potential increase in ridership resulting from a "loop" route created by the South Fowl Trail.  In particular, the EA assessed the likelihood that the South Fowl Trail would become a destination for OHVs, concluding that because the trail was not connected to other long-range trail systems in the national forest it was unlikely to result in a significant increase in ridership.

In sum, the Court finds that the Forest Service's EA adequately considered the potential cumulative effects of illegal use and increased ridership resulting from the South Fowl Trail, and provided a sufficient rationale upon which to conclude that these effects will not be significant.  In so deciding, the Court reiterates that NEPA prohibits uninformed, not unwise, agency action.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).  Whatever plaintiffs' views on the wisdom of the Forest Service's decision, the Court cannot conclude that the EA is uninformed as it relates to the potential cumulative effects of the South Fowl Trail.  As such, the Forest Service's decision to issue a FONSI is not arbitrary and capricious on this basis.

### C.    Sound Impacts

Finally, plaintiffs argue that the EA lacks analysis of the noise impact resulting from snowmobile use on the South Fowl Trail.  The EA found that

> The sound of snowmobile traffic on [Alternative 2] is likely to carry to Royal Lake and beyond.  The route is approximately 230 feet above Royal Lake with an immediate backdrop of 150 feet of cliffs to the top of the ridge, which would direct sounds toward the wilderness.  Intervening deciduous trees would provide little sound reduction.

(Admin. Rec. 159.)   The EA noted that snowmobiles manufactured after certain dates have become "progressively quieter," and that measurements could be calculated for a range of sound impacts on observers at various locations in the wilderness, but that "such detailed data appears to be moot."  (Admin. Rec. 157.)  Rather, the EA considered that wilderness visitors would consider *any* sight or sound emanating from one of the alternative routes as negative.  The FONSI then determined, with no apparent basis in the EA, that the decibel level of a snowmobile in the adjoining wilderness, at a distance of 600-800 feet from the proposed route, would be approximately 49 decibels, noting that "a typical library is 50 decibels while a remote forest is 30 decibels."  (Admin. Rec. 38.)  The FONSI concluded that this decibel level was not significant.  Defendants argue that the EA sufficiently analyzed the sound impact in terms of sound magnitude, duration, and context.  Specifically, the EA noted that sound is already audible from the Royal Lake area, that the affected portion of the BWCAW is not a pristine, noise-free area, and that the area is lightly used during the winter.  Nonetheless, defendants acknowledge that the EA did not calculate or analyze decibel levels "since any noise is likely to impact wilderness users."  (Def.'s Reply Mem. at 21.)

The Court finds that the analysis of sound impact contained in the EA is inadequate to support the FONSI.  The EA provides no quantitative evidence or analysis of decibel levels projected by the South Fowl Trail into the adjoining wilderness.  Instead, the FONSI merely approximates the decibel level in the BWCAW as 49 decibels, and concludes that that sound impact is not significant.  The absence of any supporting data in the EA deprives interested parties of information relevant to the

agency's decision-making process and thus undermines the procedural safeguards of NEPA. Further, the EA determined that an analysis of sound impact in the BWCAW was "moot" because visitors to the wilderness would likely consider any sound to be negative. (Admin. Rec. 157.) But a heightened sensitivity to the environmental impact on adjacent wilderness does not support the Forest Service's decision that an analysis of the sound impact is unnecessary. Rather, it underscores the need for a more detailed analysis in an EIS. As discussed above, agency activity that results in sound that is louder, more constant, more frequent, or of a different quality, than the sound that presently exists within the wilderness, is more likely to degrade the wilderness character from its present condition and thus result in a violation of § 4(b) of the Wilderness Act. As such, the Court finds that the potential sound impact of the South Fowl Trail on the adjoining wilderness necessitates a more thorough analysis of the environmental impact and requires the agency to prepare an EIS.

Finally, the Court finds persuasive plaintiffs' analogy to the *Sierra Club Big Grass* case. 352 F. Supp. 2d at 923. There, the Court determined that the Forest Service's decision to allow a timber harvest in a narrow strip of land between two parts of the BWCAW required an EIS. In assessing whether the timber harvest would have a significant impact on the wilderness, the Court found significant the fact that the project area was uniquely located in a narrow corridor separating two units of the Boundary Waters. *Id.* at 924. Further, the Court determined that the affected wilderness was "used heavily year-round by recreational visitors," and that defendants had failed to include analysis of potential illegal motorized use in the wilderness area caused by new road

construction. *Id.* at 924.   Defendants attempt to distinguish *Sierra Club Big Grass*, arguing that the South Fowl Trail is not on a similarly "unique" narrow corridor between wilderness areas, and that the wilderness around Royal Lake receives very light recreational use.   Defendants argue that the instant case is more similar to *Sierra Club Tomahawk*, where the Court distinguished *Sierra Club Big Grass* and held that a Forest Service timber project did not require an EIS.  *Sierra Club Tomahawk*, 428 F. Supp. 2d at 942 (D. Minn. 2006).   Specifically, the *Sierra Club Tomahawk* Court noted that the proposed timber project did not lie in a narrow corridor connecting two separate portions of the BWCAW, and that the record did not establish that the project area was used heavily year-round by recreational visitors.  *Id.* at 951.  Additionally, the Court found that the proposed logging activity would be of limited duration, and the visual impact would be minimized by a buffer area between the logging area and the wilderness area.  *Id.* at 952.

Similar to the unique geographic location in *Sierra Club Big Grass*, the South Fowl Trail would be located along a steep cliff overlooking the BWCAW, compounding the potential sound impact by reflecting sound off the cliffs and into the wilderness. Although the Royal Lake area is not as heavily used as the area in *Sierra Club Big Grass*, the South Fowl Trail has no buffer zone between it and the adjacent wilderness, particularly during the winter months, and the snowmobile activity along the trail is to continue indefinitely.  *Cf. Sierra Club Tomahawk*, 428 F. Supp. 2d at 952 (finding EIS not necessary in part because proposed logging activity would be limited in duration and separated from the wilderness by a buffer area).  As such, *Sierra Club Big Grass* supports

the Court's finding that the Forest Service's decision to issue a FONSI in this case is not adequately supported.

The Court concludes that the Forest Service has not provided sufficient analysis to support its conclusion that the sound impact of the South Fowl Trail is not significant. The Forest Service's decision to issue a FONSI on this basis is arbitrary and capricious. The sounds of snowmobiles and ATVs from a snowmobile trail on the perimeter of the BWCAW, high above a wilderness lake will surely impact the solitude of the wilderness. The Court orders the Forest Service to promptly prepare an EIS to evaluate more thoroughly the sound impact in the BWCAW, and to suspend further activity on the South Fowl Trail pending completion of the EIS.

## VI.    PROPERTY CLAUSE

Intervenors seek summary judgment on grounds that the motorboat limitations of § 4 of the BWCAW Act exceed Congress's power under the Property Clause. Intervenors seek an order removing the motor limits placed on North and South Fowl Lakes under the BWCAW Act.  The Property Clause provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."   U.S. Const. art. IV, s. 3, cl. 2. Intervenors argue that the Property Clause prohibits Congress from regulating any areas that fall outside the BWCAW, such as the Fowl Lakes.  As such, intervenors contend that the horsepower restrictions imposed by § 4 on lakes outside the BWCAW are unconstitutional.

The Eighth Circuit has squarely rejected this argument. In *Minnesota by Alexander v. Block*, the court held that Congress, in enacting § 4, "acted within its power under the Constitution to pass needful regulations respecting public lands." 660 F.2d 1240, 1251 (8th Cir. 1981), *cert. denied*, 455 U.S. 1007 (1982). As such, the Property Clause permits Congress to "regulate conduct off federal land that interferes with the designated purpose of that land." *Id.* at 1249-50. Intervenors present no compelling arguments to the contrary, and their motion for summary judgment is therefore denied.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' motion for summary judgment [Docket No. 22] is **GRANTED in part** and **DENIED in part**. Defendants' motion is **GRANTED** as to Counts I, II, and IV of plaintiffs' Complaint. Defendants' motion is **DENIED** as to Count V of plaintiffs' Complaint. Defendants' motion is **DENIED without prejudice** as to Count III of plaintiffs' Complaint.

2.     Plaintiffs' motion for summary judgment [Docket No. 26] is **GRANTED in part** and **DENIED in part**. Plaintiffs' motion is **GRANTED** as to Count V of its Complaint. Plaintiffs' motion is **DENIED** as to Counts I, II, and IV of its Complaint. Plaintiffs' motion is **DENIED without prejudice** as to Count III of its Complaint.

3.     The Forest Service shall prepare an Environmental Impact Statement assessing the sound impact of each of the proposed South Fowl Trail routes on the

adjoining wilderness area, consistent with this Memorandum Opinion and Order.  The

Forest Service is enjoined from conducting any further activity on the proposed trail

pending completion of the EIS.

      4.      Intervenors' motion for summary judgment [Docket No. 17] is **DENIED**.


DATED:  September 28, 2007                  _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                      United States District Judge