## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| IZAAK WALTON LEAGUE OF AMERICA, INC., WILDERNESS WATCH, SIERRA CLUB NORTHSTAR CHAPTER, and NORTHEASTERN MINNESOTANS FOR WILDERNESS, | Civil No.  06-3357 (JRT/LIB) |

Plaintiffs,

v.

THOMAS TIDWELL**,** Chief of the
United States Forest Service;  and TOM
VILSACK, Secretary of Agriculture,

**MEMORANDUM
OPINION AND ORDER**

Defendants,

and

COOK COUNTY,
CONSERVATIONISTS WITH
COMMON SENSE, and ARROWHEAD
COALITION FOR MULTIPLE USE,

Intervenors.

---

Charles N. Nauen, David J. Zoll, and Kristen G. Marttila, **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN  55401, for plaintiffs.

David W. Fuller, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN  55415, for defendants.

David R. Oberstar, **FRYBERGER, BUCHANAN, SMITH & FREDERICK**, 302 West Superior Street, Suite 700, Duluth, MN 55802, for intervenors.

This opinion in this case is the next stage in long-standing litigation between four

environmental advocacy organizations and the United States Forest Service over the

proposed South Fowl Snowmobile Trail.  The proposed trail runs through the Superior

National Forest in northeastern Minnesota, adjacent to the Boundary Waters Canoe Area Wilderness ("BWCAW" or "wilderness").  This Court previously ordered the Forest Service to produce a full Environmental Impact Statement ("EIS") analyzing the proposed trail's effects on sound quality in the BWCAW.  Since then, the Forest Service has completed its environmental analysis and selected a preferred route.  The plaintiffs challenge the Forest Service's decision as violating both Section 4(b) of the Wilderness Act and the National Environmental Policy Act ("NEPA").

The matter is before the Court on cross-motions for summary judgment.  Because the Forest Service's proposed action does not impermissibly degrade the wilderness character of the affected portion of the BWCAW and because any error on the part of the Forest Service in failing to disclose its adaptive management strategy in the EIS was harmless, the Court will grant the Forest Service's and intervenors' summary judgment motions on both the Wilderness Act and NEPA claims.  The Court will deny plaintiffs' motion for summary judgment and enter final judgment.

## BACKGROUND

## I.    DEVELOPMENT OF THE SOUTH FOWL SNOWMOBILE TRAIL[1]

In 2003, the Forest Service learned that snowmobilers were illegally crossing the BWCAW to travel between South Fowl Lake and McFarland Lake.  (Aff. of Kristen G.

---

[1] Only the facts relevant to the current stage of litigation are included here.  For a more complete description of the facts relating to the initial development of the snowmobile trail and the initial Environmental Assessment, and the Court's finding that it was deficient, see *Izaak Walton League of America, Inc. v. Kimbell*, 516 F. Supp. 2d 982, 984-86 (D. Minn. 2007).

Marttila ("Marttila Aff."), Ex. C (Record of Decision ("ROD") at 12-13), July 1, 2014, Docket No. 157; AR_001415-AR_001416.)[2]   The Forest Service shut down the unlawful route, known locally as the Tilbury Trail, diverting snowmobilers south along existing roadways.   (ROD at 13-14; AR_001416-AR_001417.)   Since it is dangerous to have snowmobilers regularly traveling along steep and narrow roads, the Forest Service decided to create a new snowmobile trail that would connect the two lakes and allow snowmobilers to continue to travel safely and efficiently.   (*See* ROD at 13-14; AR_001416-AR_001417.)

In 2005, the Forest Service released an environmental assessment ("EA") for the proposed South Fowl Trail.   (Marttila Aff., Ex. B (Final EIS ("FEIS")) at 11; AR_00925.)   The EA identified four action alternatives and one no-action alternative.   (AR_2006_0118-AR_2006_0123.)   Alternative 2 was the northernmost of the proposed alternatives, running the closest to the BWCAW.   (AR_2006_0118-AR_2006_0120.)

The EA recognized the possibility of increased illegal recreational use resulting from the construction of a new snowmobile trail.   (AR_2006_0149-AR_2006_0151.) However, the EA noted that the project area is not a popular destination for off-highway vehicles, and that Alternative 2 was unlikely to result in additional incursions into

---

[2] Citations to record documents filed electronically refer to the CM/ECF pagination unless otherwise noted.   Most of these documents are excerpts from the Administrative Record. As a result, for added convenience, where possible the Court will also provide the corresponding Administrative Record citation.   If a document has not been filed electronically and is not available on CM/ECF, but is part of the Administrative Record, the Court will provide only the Administrative Record citation.

adjoining wilderness because of the steep terrain separating the trail from the BWCAW. (*Id.*)

Among other impacts, the EA considered the potential projection of sound into the BWCAW from each alternative.  The EA found that the sound of snowmobile traffic from Alternative 2 would carry directly into the adjoining wilderness.  Because wilderness visitors would consider any sight or sound from snowmobiles to be negative, the EA dispensed with any quantitative measurements of the sound impact, stating that "such detailed data appears to be moot."  (AR_2006_0157.)

In 2006, the Forest Service issued a Decision Notice and Finding of No Significant Impact ("DN/FONSI") selecting Alternative 2 for the South Fowl Trail.  (Marttila Aff., Ex. E (DN/FONSI) at 4-7 (explaining the reasons for selecting Alternative 2); AR_2006_0017-AR_2006_0020.)  The DN/FONSI estimated that the volume of snowmobile sound reaching the adjoining wilderness would reach approximately 49 decibels at most, and concluded that this decibel level was not significant.  (DN/FONSI at 14; AR_2006_0038.)  Several environmental organizations appealed the DN/FONSI.  On May 18, 2006, a Forest Service Appeal Reviewing Officer ("ARO") recommended affirming the selection of Alternative 2, as set forth in the DN/FONSI, and, on May 22, 2006, the Forest Supervisor (also called, in this case, the Appeal Deciding Officer) adopted that recommendation.  (AR_2006_3559-AR_2006-3561.)

## II.     THE DISTRICT COURT'S PREVIOUS DECISION

After exhausting their administrative remedies, the environmental organizations – the Izaak Walton League of America, Inc.; Wilderness Watch; Sierra Club Northstar Chapter; and Northeastern Minnesotans for Wilderness ("plaintiffs") – filed a complaint with this Court in August 2006, with the Chief of the Forest Service and the U.S. Secretary of Agriculture ("defendants" or "Forest Service") listed as defendants. (Compl., Aug. 17, 2006, Docket No. 1.)  Relevant to this stage of the litigation, they alleged in Count III that Alternative 2 would project the sounds of snowmobiles into the wilderness area in violation of Section 4(b) of the Wilderness Act, (*id.* ¶¶ 72-73), and in Count V that the Forest Service violated NEPA by failing to prepare an EIS for the proposed trail, (*id.* ¶¶ 76-79).[3]  The parties filed cross-motions for summary judgment. (Defs.' Mot. for Summ. J., Nov. 9, 2006, Docket No. 22; Pls.' Mot. for Summ. J., Nov. 9, 2006, Docket No. 26.)

As to Count III, the Court held that the Wilderness Act could proscribe activity outside of a wilderness area, but determined that more data was needed to determine whether Section 4(b) had been violated in the instant case.  *Izaak Walton League of Am., Inc. v. Kimbell*, 516 F. Supp. 2d 982, 988-90 (D. Minn. 2007) (stating that "the agency's duty to preserve the wilderness area is wholly independent of the source or location of that activity" and concluding that, as a result, Section 4(b) of the Wilderness Act "may

---

[3] The Court refers here to the original complaint in order to discuss comprehensively the relevant history of the case.  The Court notes, however, that the parties filed an amended complaint in this case, which is the operative complaint.  (Am. Compl. ¶ 41, Aug. 30, 2013, Docket No. 137.)

apply to agency activity that occurs outside of the boundaries of the wilderness area"). Regarding the NEPA claim, the Court concluded that the "Forest Service [had] not provided sufficient analysis to support its conclusion that the sound impact of the South Fowl Trail is not significant." *Id.* at 997.  It directed the Forest Service to prepare an Environmental Impact Statement "to evaluate more thoroughly the sound impact in the BWCAW, and to suspend further activity on the South Fowl Trail pending completion of the EIS." *Id.* at 997.

## III.    THE SOUND ANALYSIS

### A.    Draft and Final Environmental Impact Statements

Pursuant to this Court's order, the Forest Service published a Draft Environmental Impact Statement ("DEIS") in 2010.  (Am. Compl. ¶ 41, Aug. 30, 2013, Docket No. 137; Marttila Aff., Ex. F (DEIS); AR_000434-000783.)   The DEIS analyzed three action alternatives and evaluated the future impacts of the existing snowmobile trail as a no-action alternative.  (*See* DEIS at 13-29; AR_000492-AR_000508; *see also* 36 C.F.R. § 220.7(b)(2) (2014) (allowing an EA to consider the impacts of taking no action)). These alternatives are the same options at issue today.   The no-action alternative is Alternative 1; Alternative 2 is the northernmost route, running closest to the BWCAW; and Alternatives 3 and 4, which are slightly different, are largely the same as the no-

action alternative.[4]  (DEIS at 13-20; AR_000492-AR_000499.)  The plaintiffs submitted comments disputing the sufficiency of the noise analysis in the DEIS and citing a report by sound expert Richard D. Horonjeff.  (Am. Compl. ¶ 42; AR_000869-AR_000880.)  In 2011, the Forest Service released both a Final Environmental Impact Statement ("FEIS") and a Record of Decision ("ROD").    (FEIS; AR_000916-AR_001398; ROD; AR_001399-AR_001488.)

The FEIS analyzed the same no-action alternative and three action alternatives as the DEIS.  (FEIS at 11-12; AR_000925-AR_000926.)  The FEIS noted that audible snowmobile sound already reaches the entire portion of the BWCAW that would be impacted by any of the alternatives due to existing motor use in the territory outside the wilderness area.  (FEIS at 30-31; AR_000974-AR_000975.)  The increase in the decibels ("dBA") of sound heard under Alternative 2 would be at most 5 dBA at Royal Lake, the portion of the wilderness that is closest to Alternative 2.  (FEIS at 38; AR_000982.)  The FEIS concluded that sounds from single snowmobile sleds would be audible for 11.8% of the week with Alternative 2, versus 11.0% of the week with the no-action alternative.  (FEIS at 40; AR_000984.)  Two snowmobile sleds or groups of snowmobile sleds would be audible for 5.9% of the week with Alternative 2, versus 5.5% of the week for the no-action alternative.  (FEIS at 40; AR_000984.)  The FEIS also analyzed how long the snowmobile noise would be above the natural ambient noise level.  (FEIS at 40;

---

[4] Importantly, however, neither the DEIS nor the subsequent FEIS listed or discussed a hybrid or adaptive management approach (i.e., adopting one alternative and a set of conditions that, if triggered, would lead to modifications to the chosen alternative).  (Am. Compl. ¶ 43.)

AR_000984.)  For a single sled under Alternative 2, the duration above natural ambient would be 2.2% of the week; it would be 1.1% of the week for two sleds or a group. (FEIS at 40; AR_000984.)

As for the percentage of wilderness impacted, the FEIS determined that 10.3% of the wilderness would be impacted by the no-action alternative, versus 10.8% with Alternative 2.   (FEIS at 37; AR_000981.)   The FEIS noted that the Tilbury Trail impacted 12.8% of the wilderness.  (FEIS at 37; AR_000981.)  The FEIS, like the DEIS before it, included a section describing the actions the Forest Service would take "to monitor the predictions and assumptions for the project."  (FEIS at 103-05; AR_001047-AR_001049.)  The FEIS set out five monitoring objectives: (1) ensure that the trail is properly constructed; (2) keep use of the trail within its capacity; (3) eliminate any illegal motorized trail use; (4) limit erosion; and (5) stop the establishment of non-native invasive plant species along the trail.  (FEIS at 105; AR_001049.)

### B.      Record of Decision

The ROD selected Alternative 2 as the new snowmobile route, but also adopted an adaptive management strategy not discussed in the FEIS.   (*See* ROD at 16-20; AR_001419-AR_001423.)  Under the adaptive management strategy, "Alternative 2 will be effectively closed and obliterated and Alternative 4 will be constructed" if specific conditions are met: (1) if the State, County, and Forest Service decide to put a connecting system of snowmobile trails from the State grant-in-aid trails to the McFarland or South Fowl Lakes area; (2) if measures to keep Off Highway Vehicles ("OHVs") off the trail

are ineffective; (3) if snowmobilers develop a pattern of intentionally diverting from Alternative 2 to travel through the wilderness; or (4) if snowmobile use exceeds Alternative 2's capability such that it causes excessive resource damage or excessive interaction between snowmobilers.  (ROD at 18-19; AR_001421-AR_001422.)  The monitoring plan in the ROD is the same as in the FEIS.  The Forest Service would monitor the trail, largely through regular field checks at different intervals, for capacity issues, illegal off-trail activity, erosion, and non-native invasive plant species.  (ROD at 21; AR_001424.)

The ROD considered the sound impacts of Alternatives 2 and 4 in the BWCAW. (ROD at 26-28; AR_1429-AR_001431.)  Because snowmobile sound already reaches the BWCAW throughout the project area, the ROD concluded that neither Alternatives 2 nor 4 would change the type of sound heard in the wilderness area.  (ROD at 26-27; AR_001429-AR_001430.)  As for area of sound impact, the ROD noted that the overall project area is 7,400 acres.  (ROD at 27-28; AR_001430-AR_001431.)  It stated that neither Alternative 2 nor 4 would increase the wilderness acreage that would experience audible[5] snowmobile sound, although Alternative 2 would increase by 3 to 36 acres the

---

[5] The ROD defines the relevant terms as follows:

- **dBA**: "Refers to A-weighted Decibels, which is considered the best Decibel weighting for sounds discernable by the human ear."  (ROD at 27; AR_00001430.)

- **Ambient Sound**: "Refers to the set of sounds present in area, including those generated by nature . . . and human generated sound such as from snowmobiles or trucks."  (ROD at 27; AR_00001430.)

(Footnote continued on next page.)

amount of wilderness that would experience snowmobile sound above natural ambient levels. (ROD at 27-28; AR_001430-AR_001431.) Because this 36 acres amounts to only 0.5% of the project area, and because Alternative 2 does not pose an increase if considered against the original Tilbury Trail (versus the no-action alternative), the ROD concluded there would be a relatively minor sound increase under Alternative 2 (and no increase under Alternative 4). (ROD at 27-28, 35; AR_001430-AR_001431, AR_001438.)

Since "the same use level of snowmobiles is anticipated under all alternatives," the ROD also anticipated no difference in the frequency of snowmobile sound under any alternative. (ROD at 27; AR_001430.) As for duration, the ROD noted that Alternative 2 poses only a 0.8% increase in the duration of snowmobile traffic experienced in the wilderness each week. (ROD at 28; AR_001431.)

Because the area of the BWCAW affected is already considered a Semi-Primitive, Non-Motorized management area, where "[o]pportunities for experiencing isolation and

_____

(Footnote continued.)

- **Natural Ambient Sound**: "Refers to the set of sounds generated by nature . . . and does not include human generated sound such as from snowmobiles or trucks." (ROD at 27; AR_00001430.)

- **Audible Sound**: "Refers to any sound discernible to the human ear." (ROD at 27; AR_00001430.)

- **Sound Pressure Level or Sound Level**: "The amount of pressure generated by a sound. More commonly considered as how loud a sound is, or as the 'volume' of the sound." (ROD at 27; AR_00001430.)

The ROD notes that "[a] source sound level may be lower than the ambient sound level, yet still be heard or audible since the sound is of a different type. For example, background sound such as wind may be louder than a snowmobile, yet the snowmobile may still be discerned since it generates a different type of sound than wind does." (ROD at 27; AR_00001430.)

solitude are moderate to low," the ROD concluded that this minor sound increase would not change the character of the wilderness area beyond what should be expected of it under the Forest Plan.  (ROD at 29-31 (quoting Forest Service Eastern Region, Land and Resource Management Plan ("Forest Plan") (2004), at 3-45); AR_001432-AR_001434.) The ROD also noted that very few, if any, human visitors travel to the Royal Lake and River portion of the BWCAW during the winter and, to the extent they do, the sights and sounds of snowmobiles will have a minor impact on them.  (ROD at 31-32; AR_001434-AR_001435.)

Considering these findings in light of the already-existing character of the wilderness area at issue (e.g., the fact that Congress placed this portion of the BWCAW boundary close to heavily used roads and lakes), the ROD concluded that its selection of Alternative 2, and in the alternative, under an adaptive management strategy, Alternative 4, would not degrade the wilderness character of the relevant portion of the BWCAW under the Wilderness Act.  (ROD at 34-35; AR_001437-AR_001438.)

## C.    Administrative Appeal

In November 2011, three of the four plaintiffs (all but the Izaak Walton League), filed an administrative appeal of the ROD, challenging both the sufficiency of the sound analysis and whether, even accepting the Forest Service's sound analysis, the ROD was in compliance with the Wilderness Act.  (Am. Compl. ¶ 46; AR_001506-AR_001508, AR_001510-AR_001514.)   They also challenged the procedural impropriety of not mentioning the adaptive management approach in its DEIS or FEIS.  (Am. Compl. ¶ 46;

AR_001508-AR_001510.)  The ARO affirmed the ROD, stating that "no violation of any law, regulation, or policy" had occurred.  (AR_001538.)  But the ARO did concede "that the public was unable to review and comment on the effectiveness or appropriateness of the 'triggers or caveats' described in the ROD that would cause the Responsible Official to close the Alternative 2 route and open Alternative 4."  (AR_001530.)  In addition, the ARO directed the Forest Service to conduct additional sound analysis before implementing Alternative 2.   Specifically, the Forest Service was to consider new information provided by the acoustics expert retained by the plaintiffs, Richard Horonjeff, as well as retain its own acoustics expert to evaluate the existing analysis. (AR_001537.)   If the existing analysis was found to be "insufficient to provide reasonable technical estimations of acoustics effects," the Forest Service would be required "to engage a recognized independent acoustics expert to conduct such a study." (*Id.*)

The ARO concluded that "[w]hile the Forest [Service] does not appear to have the expertise to independently design and conduct such a [sound or acoustics] study with certainty of reliable results, it clearly does have the expertise to apply the results of such a study to the management issues related to the Wilderness Act."   (*Id.*)   The Appeal Deciding Officer/Forest Supervisor adopted the entirety of the ARO's analysis in a December 21, 2011 decision.  (AR_001522-AR_001523.)  That decision constituted the final agency action pursuant to the Administrative Procedure Act ("APA"), but the decision could not be implemented until the Forest Service completed additional acoustics analysis.  (AR_001523.)

### D.  Supplemental Information Report

The Forest Service presented its additional acoustics analysis in a March 7, 2013 Supplemental Information Report ("SIR").  To implement the directives of the ARO decision, the Forest Service contracted with the National Park Service Natural Sounds and Night Skies Division ("NPS") "to conduct an independent review of the South Fowl FEIS."  (Marttila Aff., Ex. D (SIR) at 5; SIR_13E_000004.)  The NPS subsequently produced a report and model data, both of which form the basis for the SIR's conclusions, along with data provided in the Horonjeff letter.  (SIR at 6; SIR_13E_000005.)

The SIR's review focused on the same factors that had been analyzed in the DEIS, FEIS, and ROD: new types of sound in the wilderness area and the sound's volume, area, frequency, and duration.[6]  (SIR at 7; SIR_13E_000006.)

As for the type of sound heard in the BWCAW portion of the project area, the SIR confirmed the FEIS's conclusion that "snowmobiles are currently heard throughout the project area under all alternatives" and that, as a result, Alternative 2 would not change the type of sound projected into the BWCAW.  (SIR at 8; SIR_13E_000007.)  Similarly,

---

[6] In addition to listing the same definitions as those found in the ROD, the SIR elaborated on the definition of sound pressure level or sound level:

- **Sound Pressure Level or Sound Level**: "The amount of pressure generated by a sound. More commonly considered as how loud a sound is, or as the 'volume' of the sound. $L_{10}$: The sound level that is exceeded 10% of a given time period. $L_{50}$: The sound level that is exceeded 50% of a given time period. $L_{90}$: The sound level that is exceeded 90% of a given time period."  (SIR at 7; SIR_13E_000006.)

the SIR found no new information to dispute the FEIS's conclusion that the frequency of snowmobile traffic would not change due to the construction of Alternative 2.  (SIR at 8-9; SIR_13E_000007-SIR_13E-000008.)

However, the SIR did modify other conclusions articulated in the FEIS.  The SIR noted that the area newly affected by snowmobile sound above the natural ambient level would increase by 0.9% (65 acres), as opposed to the 0.5% (36 acres) estimate in the FEIS.  (SIR at 10; SIR_13E_000009.)   Given that both numbers amount to small percentages of the much larger 7,430-acre project area, the SIR concluded the difference between the NPS model and the FEIS was only "slight."  (SIR at 10; SIR_13E_000009.) It noted that the duration of sound audible above natural ambient levels under Alternative 2 would be 4.8% of the week with a single sled, 2.6% greater than under the FEIS.  (SIR at 17; SIR_13E_000016.)  It labeled this difference "relatively small."  (SIR at 17; SIR_13E_000016.)

The SIR also found a greater impact in sound volume than estimated in the FEIS. Using the $L_{50}$ sound level as a baseline, the SIR concluded that the $L_{50}$ natural ambient sound level in the relevant area of the BWCAW was 23 dBA, 11 dBA less than the Forest Service FEIS estimate of 34 dBA.  (SIR at 9; SIR_13E_000008.)  As a result, the impact of snowmobile sound (i.e., non-natural ambient sound) would be greater than the Forest Service predicted in the FEIS under any alternative, whether no-action or action.  (*See* SIR at 9; SIR_13E_000008.)  Because the SIR estimated a lower natural ambient sound level than the FEIS, and greater maximum sound levels with snowmobiles than the FEIS, the SIR also estimated larger jumps in sound under Alternative 2 than the FEIS.

The SIR estimated that near Royal Lake – the portion of the BWCAW closest to the proposed new routes – the maximum sound level when including snowmobile traffic would be 32 dBA (an increase of 9 dBA over the natural ambient level) under the no-action alternative and Alternatives 3 and 4.  (SIR at 15; SIR_13E_000014.)   The maximum sound level under Alternative 2 would be dBA 50, or a 27 dBA increase over the natural ambient level.  (SIR at 15; SIR_13E_000014.)  In the Royal River area, the maximum sound level under Alternative 2 would be 34 dBA, an increase of 11 dBA over natural ambient.  (SIR at 15; SIR_13E_000014.)  Under all alternatives, including the no-action alternative, the SIR estimated that maximum sound levels would be 55 dBA at Little John Lake and 74 dBA at North Fowl Lake.  (SIR at 15; SIR_13E_000014.)  Those two lakes are near the western and eastern edges of the Tilbury Trail, respectively.  The sound level at those locations, under any alternative, is higher than the sound level under Alternative 2 at Royal Lake, due in part to the existing traffic – snowmobile and otherwise – at and around both lakes.     (SIR at 15-19;  SIR_13E_000014-SIR_13E_000018.)

In addition to providing a more precise estimation of projected decibel levels, the SIR also clarified their qualitative effect.  Noting that the FEIS had stated that a 10 dBA increase would be heard as a "doubling in loudness," (AR_001291), the SIR observed that this "doubling" concept may not be accurate for "transportation noise."  (SIR at 14; SIR_13E_000013.)  The SIR noted that an increase of 5.5 dBA may result in a "doubling of annoyance," although it also stated that the "annoyance" indicator is less effective when gauging the effect of sound on short-term park visitors.  (SIR at 14 & n.2;

SIR_13E_000013.)  Regardless of the degree of increase, the SIR determined that the projected decibel levels would be relatively quiet to the ear.  The sound level at Royal Lake, the loudest point of impact under Alternative 2, would only reach the level of moderate rainfall or a library.[7]  (SIR at 15-16; SIR_13E_000014-SIR_13E_000015.)  This is quieter than the snowmobile sound in nearby portions of the wilderness, which is as loud as 55 dBA at the portions of the BWCAW near Little John Lake and 74 dBA near North Fowl Lake.  (SIR at 15-16; SIR_13E_000014-SIR_13E_000015.)  Seventy-four dBA is similar to the volume of traffic, vacuums, or a business office.  (SIR at 15-16; SIR_13E_000014-SIR_13E_000015.)  Thus, the SIR concluded that the effect of the

---

[7] Table SIR-1 in the SIR, which is replicated here, provides more detail on the qualitative effect of various dBA levels:

| Table SIR-1: General Sound Levels | | | |
|---|---|---|---|
| dBA Level | American Academy of Audiology | Minnesota Pollution Control Agency | Environmental Protection Agency ("EPA") |
| 100 | Snowmobiles | Jointer/planer | |
| 90 | Lawnmower, power tools | Chainsaw | |
| 80 | Alarm clocks | Heavy truck traffic | Apartment by freeway (88 dBA) |
| 70 | Traffic, vacuums | Business office | |
| 60 | Normal conversation | Conversational speech | |
| 50 | Moderate rainfall | Library | Wooded residential (51 dBA) |
| 40 | Quiet library | Bedroom | Rural residential (40 dBA) |
| 30 | Whisper | Secluded woods | Wilderness ambient (35 dBA) |
| 20 | Leaves rustling | Whisper | |

(SIR at 9; SIR_13E_000008.)

sound increase on Royal Lake and Royal River under Alternative 2, even taking into account the new NPS report and model, would be "small in scope."   (SIR at 15; SIR_13E_000014.)   As a result, the SIR effectively affirmed the ultimate conclusions of the FEIS and ROD.[8]   (*See* SIR at 15; SIR_13E_000014 (finding that the context and intensity of the impacts were within the scope of what was disclosed in the FEIS).)

Considering all these factors together, the SIR found that there was "not a need to correct, supplement, or revise . . . the South Fowl FEIS" and that the FEIS was "adequate to support the original decision."   (SIR at 23; SIR_13E_000022.)   Following the release of the SIR, the Forest Service moved forward with the implementation of the South Fowl Snowmobile Trail.

### E.   Amended Complaint and Cross-Motions for Summary Judgment

The plaintiffs filed an amended complaint with this Court on August 30, 2013.[9] (Am. Compl.)   In Count I, all four plaintiffs assert that the intrusion of sound into the

---

[8] The SIR also concluded that the new NPS data supports the ROD's conclusion that Alternative 2 would have a minimal impact, as compared to the other alternatives, on opportunities for solitude in the BWCAW.   (SIR at 18-19; SIR_13E_000017-SIR_13E_000018.)

[9] Along with their amended complaint, the plaintiffs filed an additional review and analysis by sound expert Richard Horonjeff.   (Am. Compl., Ex. A (Richard Horonjeff Review of Supplemental Analyses ("Horonjeff Review")).)   The APA limits judicial review to the administrative record that was before the agency when it made its decision.   *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004).   The plaintiffs argue that, because the ARO had required the Forest Service to consider earlier comments by Horonjeff, it makes no sense to reject his comments at this stage.   Moreover, they argue that they had no other opportunity to submit these comments because the Forest Service did not offer an opportunity for comment on the SIR.

(Footnote continued on next page.)

BWCAW from Alternative 2 would violate the Wilderness Act, along with its implementing regulations, the Forest Service Manual, and the APA. (Am. Compl. ¶¶ 59-60.) In Count II, all plaintiffs except the Izaak Walton League claim that the Forest Service violated NEPA and the APA by selecting an adaptive management strategy in the ROD that "the agency had never specifically analyzed and on which the public never had an opportunity to comment." (*Id.* ¶¶ 61-63.) In addition to a declaratory judgment, the plaintiffs seek preliminary and permanent injunctive relief "prohibiting construction of the South Fowl Snowmobile Trail." (*Id.* at ¶¶ 1-3.)

The plaintiffs filed a motion for summary judgment on July 1, 2014. (Pls.' Mot. for Summ. J., July 1, 2014, Docket No. 154.) On August 15, the Forest Service filed a cross-motion for summary's judgment. (Defs.' Cross Mot. for Summ. J., Aug. 15, 2014, Docket No. 162.) In addition, Cook County, Minnesota, along with two organizations, Conservationists with Common Sense and the Arrowhead Coalition for Multiple Use ("intervenors"), filed their own motion for summary judgment. (Intervenors' Mot. for Summ. J., Aug. 15, 2014, Docket No. 159.)

---

(Footnote continued.)

Although the plaintiffs are correct that the ARO directed the Forest Service to consider Horonjeff's comments, the ARO was referring specifically to analysis by Horonjeff included in the plaintiffs' administrative appeal. (AR_001537.) The new Horonjeff report attached to the amended complaint, on the other hand, is outside the scope of the ARO's recommendation and, consequently, outside the scope of the administrative record. To the extent the plaintiffs contend that it was unfair for the Forest Service to refuse to accept comments on the SIR, the Court will assess the Forest Service's compliance with NEPA more thoroughly below. Because "exceptions [to the bar on extra-record evidence] apply only under extraordinary circumstances," the Court declines to consider this additional evidence. *Voyageurs Nat'l Park Ass'n*, 381 F.3d at 766.

## ANALYSIS

### I.      STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.     THE ADMINISTRATIVE PROCEDURE ACT

The Court's review of agency decisions is limited by the Administrative Procedure Act ("APA").  The plaintiffs bring their amended complaint – both their Wilderness Act and NEPA claims – under Section 706 of the APA.  (Am. Compl. ¶¶ 60, 63.)  Section 706(2)(A) requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Section 706(1) provides that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency

action. The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

"Whether an agency's action is arbitrary and capricious depends on whether the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1121 (8th Cir. 1999) (internal quotation marks omitted)). This standard "is a narrow one and the court is not permitted to substitute its judgment for that of the agency." *United States v. Massey*, 380 F.3d 437, 440 (8th Cir. 2004). Agencies are entitled to deference in a variety of areas, including in their "choice of methodology as long as it is not arbitrary or without foundation." *Friends of the Boundary Waters Wilderness*, 164 F.3d at 1130.

## III.    FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

First, the Forest Service asserts that the Izaak Walton League is not a proper party to this litigation because it did not participate in the administrative appeal. The Izaak Walton League is only a plaintiff as to Count I, the Wilderness Act claim. (Am. Compl. ¶¶ 59-63) The plaintiffs respond that the Izaak Walton League is a proper party because the Wilderness Act question is a purely legal one more properly resolved by the courts. *See Bartlett v. USDA*, 716 F.3d 464, 474 (8th Cir. 2013) ("[A] party's failure to exhaust should be excused if the issues are legal questions which are not suitable for administrative resolution and are more properly resolved by the courts." (internal

quotation marks omitted)).  This narrow exception to the exhaustion requirement, however, should "only be invoked if the issues involved are ones in which the agency has no expertise." *Id.* (internal quotation marks omitted).

Here, while the Forest Service may not have the expertise to conduct an advanced acoustics study and determine with specificity the sound impacts of Alternative 2, given their vast knowledge of this country's forests, they do have the expertise to apply the results of such a study in the context of the Wilderness Act – a statute the agency has administered for decades.  Indeed, the ARO concluded as much in directing the Forest Service to hire an acoustics expert to study the sound impact of Alternative 2. (AR_001537.)  Because the agency does have expertise as to the issues involved in this case, the exception to the exhaustion requirement does not apply and the Court consequently concludes that the Izaak Walton League is not a proper party in this case. However, the other three plaintiff organizations did properly exhaust their claims and are proper parties.

## IV.  WILDERNESS ACT CLAIM

The Wilderness Act of 1964, 16 U.S.C. §§ 1131-1136, was enacted to ensure that a rapidly expanding and mechanizing society did not "occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition." *Id.* § 1131(a).  The Act declares that "the policy of the Congress [is] to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." *Id.*  It tasks the federal government with

protecting wilderness areas, defining wilderness as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." *Id.* § 1131(c). Section 4(b) of the Wilderness Act sets out the government's "responsibility for preservation and administration to preserve wilderness character" as follows:

> Except as otherwise provided in this chapter, each agency administering any area designated as wilderness shall be responsible for **preserving the wilderness character of the area** and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character.

*Id.* § 1133(b) (emphasis added). This responsibility extends to agency activities that occur outside wilderness boundaries but nonetheless impact the character of designated wilderness.[10] *Izaak Walton League*, 516 F. Supp. 2d at 988-89.

While the Wilderness Act's protections plainly encompass activity that occurs outside a wilderness area – if that activity impacts the wilderness's character – the Act does **not** bar agency activity simply because that activity has **some** effect on adjoining wilderness. *Id.* at 989; *see also Minn. Ctr. for Envtl. Advocacy v. U.S. Forest Serv.* (*MCEA*), 914 F. Supp. 2d 957, 980-81 (D. Minn. 2012). To determine whether an action impermissibly degrades the wilderness character of a designated wilderness area, the

---

[10] To the extent the intervenors and the Forest Service argue the Court should reconsider its prior decision in *Izaak Walton League* regarding the applicability of the Wilderness Act outside a wilderness area, (*see* Intervenor's Mem. in Resp. to Pls.' Mot. for Summ. J. & in Supp. of Intervenor's Cross-Mot. for Summ. J. ("Intervenors' Mem.") at 10-13, Aug. 15, 2014, Docket No. 161; Reply Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. at 5 & n.2, Sept. 29, 2014, Docket No. 169), the Court concludes that neither party has offered a convincing argument for upending this Court's Wilderness Act doctrine.

Court will consider (1) the nature of the agency activity; (2) the existing character of the wilderness area; and (3) the extent to which the essential, natural characteristics of the wilderness area are changed by the agency activity in question. *Izaak Walton League*, 516 F. Supp. 2d at 989.

As to the third factor, if the agency activity in question would increase the audible sound in a wilderness area, the agency looks to several facts about that change in sound to determine if the area's natural characteristics are changed and, more broadly, if the area's wilderness character is impermissibly degraded. Agency activity that affects a wilderness area with sound that is similar in (1) volume; (2) duration; (3) frequency; and (4) quality to the sound that already exists is unlikely to result in a violation of Section 4(b). *Id.* at 989-90. On the other hand, "agency activity that results in noise that is louder, more constant, more frequent, or of a different quality, is more likely to degrade the wilderness character from its present condition and thus violate § 4(b)." *Id.* at 990. Now that the Forest Service has completed its assessment of the auditory impacts to the wilderness, the Court will apply these criteria to determine whether the impacts of the Forest Service's chosen route degrade the BWCAW's wilderness character to an extent that violates the Act.

### A.    Nature of the Agency Activity

The first factor to consider is the nature of the agency activity. The impetus for this agency action arose from the Forest Service's decision to close the original Tilbury Trail, which ran through the wilderness. (AR_000933-AR_000934.) The closure

prompted snowmobilers to begin using a dangerous alternative route alongside a road, and the Forest Service sought to provide a safer alternative.  (*See id.*)

The proposed alternative trail runs through Superior National Forest, which is managed according to the Multiple-Use Sustained-Yield Act ("MUSY").  16 U.S.C. § 528.  MUSY establishes that national forests are to be managed for multiple purposes, including "outdoor recreation."  *Id.*  Furthermore, the Wilderness Act itself states that it should not "be deemed to be in interference with the purpose for which national forests are established as set forth . . . [in] the Multiple-Use Sustained-Yield Act."  *Id.* § 1133(a)(1).  The Boundary Waters Canoe Area Wilderness Act of 1978 also directed the Forest Service "to expedite and intensify the program of dispersed outdoor recreation development on the Superior National Forest outside the Boundary Waters Canoe Area Wilderness," including consideration of "additional snowmobile trails, particularly those now planned or under construction."  Pub. L. No. 95-495, § 18(a), 92 Stat. 1649 (1978).  Thus, the nature of the agency activity – creating a new snowmobile trail in the Superior National Forest – is not inconsistent with the statutes that guide the management of this particular area, which contemplate balancing recreational uses with protecting wilderness character.

### B.     Existing Character of the Wilderness Area

Second, the Court will consider the existing character of the impacted wilderness area.  The impacted area is a "Semi-Primitive, Non-Motorized" management area within the BWCAW.  (ROD at 31; AR_001434.)  It borders private lands as well as National

Forest lands. (AR_001395; *see also* FEIS at 91; AR_001035.) Snowmobile sounds can already be heard throughout the impacted wilderness area and visitors' expectations for isolation and solitude should be "moderate to low." (ROD at 31 (quoting Forest Plan at 3-45); AR_001434; *see also* AR_000932.) Additionally, the sound of other types of engines, including motor graders and trucks operating around McFarland Lake, are currently audible on Royal Lake (FEIS at 25; AR_000969), which is where the sound impact of Alternative 2 is projected to be greatest. (*See* SIR App. A at 34, Fig. A-3; SIR_13E-000033.) Given the Forest Plan's characterization of this portion of the BWCAW, and the fact that snowmobiles and other motorized sounds are already audible throughout the affected wilderness, the construction of a new snowmobile trail is not in conflict with the existing character of the wilderness and is not, by itself, enough to establish a Wilderness Act violation. *See, e.g.*, *Vermonters for a Clean Env't, Inc. v. Madrid*, No. 1:12-CV-73, 2014 WL 7366061, at *14 (D. Vt. Dec. 24, 2014) (citing *Izaak Walton League*, 516 F. Supp. 2d at 990, and concluding that the sound from wind turbines near a wilderness area, while different in constancy, frequency, and type than what was previously audible, did not degrade the wilderness characteristics of the wilderness area because highway sounds and snowmobile traffic were already audible in the area). The inquiry turns instead on the extent of the impact.

## C. Extent of Change to the Natural Characteristics of the Area

The final and most dispositive factor is the extent to which the essential, natural characteristics of the wilderness area are changed by the agency activity. The crux of the

dispute is whether the project will impact the auditory characteristics of the wilderness to the extent that it violates the Wilderness Act. The auditory impact can be measured by the sound's volume, type, and geographic scope, as well as the length of time (duration) the sound reaches the wilderness and the frequency of the sound. (*See* SIR at 8-17; SIR_13E_000007-SIR_13E_000016.); *see also Izaak Walton League*, 516 F. Supp. 2d at 989-90 ("[A]gency activity that affects that same wilderness area with sound that is similar in volume, duration, frequency, and quality, is unlikely to result in a violation of the § 4(b).").

### 1.    Volume of the Noise

The plaintiffs' primary argument is that the South Fowl Trail – specifically Alternative 2 – will more than double, at a minimum, the noise that can be heard from the snowmobile traffic in the area. The parties cite to the NPS sound impact analysis in the SIR versus the FEIS, because the SIR concluded that the FEIS over-estimated the natural ambient sound level in the relevant wilderness area. (SIR at 9; SIR_13E_000008.) The SIR found the median $L_{50}$ natural ambient sound level to be 23 dBA.[11] (SIR at 9;

---

[11] The SIR uses as its baseline the $L_{50}$ median value of natural ambient noise. (SIR at 10; SIR_13E_000009.) The SIR uses the $L_{50}$ value because, given that extrinsic noise is audible roughly 16% of the week in the project area, the natural ambient equation ($LNat=L_{50}+A/2$) results in a value – $L_{58}$ – that is much closer to $L_{50}$ than $L_{90}$. (SIR, Ex. A at 24-25; SIR_13E_000023-SIR_13E000024.) Relying on the additional analysis conducted by their expert, Richard Horonjeff, the plaintiffs argue that the Court should use the $L_{90}$ median value to determine the natural ambient sound level. (Pls.' Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' Mem.") at 21-22, July 1, 2014, Docket No. 156.) Aside from the fact that the Court will not consider the additional analysis attached to the plaintiffs' amended complaint, based on the well-reasoned and factually supported analysis in the SIR, the Court concludes that the Forest

(Footnote continued on next page.)

SIR_13E_000008.)  The maximum sound level from current snowmobile use in the area – near Royal Lake, the location in the BWCAW that is closest to Alternative 2 – is estimated to be 32 dBA.  (SIR at 15; SIR_13E_000014.)  In other words, there is an incremental increase of 9 dBA over the natural ambient sound level when a snowmobile passes through the area under the no-action alternative.  Under Alternative 2, wilderness visitors would experience a maximum sound level near Royal Lake of 50 dBA.  (SIR at 15; SIR_13E_000014.)  Along the Royal River, the next most affected area of the wilderness after Royal Lake, a visitor would experience a maximum sound level of 34 dBA.  (SIR at 15; SIR_13E_000014.)

Under Alternative 2 at Royal Lake, where there would be a maximum sound level of 50 dBA, wilderness visitors would experience a 27 dBA increase over the natural ambient sound level or an 18 dBA increase over the sound level of the no-action alternative.  (SIR at 15; SIR_13E_000014.)  The plaintiffs note that the Minnesota

_____
(Footnote continued.)

Service was not arbitrary and capricious in using the $L_{50}$ value for the natural ambient sound level in the relevant portion of the BWCAW.  *Friends of the Boundary Waters Wilderness*, 164 F.3d at 1130 (stating that agencies are entitled to deference in their "choice of methodology as long as it is not arbitrary or without foundation").  Moreover, the NPS's $L_{90}$ estimate is not significantly different from the $L_{50}$ estimate: 18.2 versus 23.4, respectively.  (SIR, Ex. B at 47; SIR_13E_000046.)  Finally, to the extent the plaintiffs argue that the $L_{90}$ estimate more accurately captures the quiet nature of a wilderness area, they forget that the $L_{50}$ estimate is meant to capture the sound level in a location that is exceeded 50% of the time, regardless of whether that location is quiet or loud.  If a location is quiet, like a wilderness area, presumably the $L_{10}$, $L_{50}$, and $L_{90}$ values would all be quieter than if a location is loud, like a busy intersection in a bustling metropolis.

Pollution Control Agency ("MPCA") describes a 10 dBA increase as a "doubling in loudness."[12]  (SIR at 14; SIR_13E_000013.)

This Court's previous order directed the Forest Service to use the existing noise level as a baseline, which would include the current level of snowmobile sound that is beyond the natural ambient sound level (i.e., comparing the no-action alternative of a 9 dBA increase at Royal Lake to the Alternative 2 increase of 27 dBA at Royal Lake). *See* 516 F. Supp. 2d at 989-90.  But even using the natural ambient sound level as the baseline, the impact is not significant enough to constitute a Wilderness Act violation. While a 27 dBA increase appears dramatic on paper, the increase in sound will not be as significant, practically speaking, as the plaintiffs allege.  Indeed, the sound level will, at most, change from that of rustling leaves or a whisper to moderate rainfall or a wooded residential neighborhood.  (SIR at 16, tbl. SIR-3; SIR_13E_000015.)  Under the various metrics used by the NPS, the new, louder Royal Lake area will still be quieter than normal conversation, and will certainly be quieter than traffic, alarm clocks, power tools, or a snowmobile in close proximity.  (SIR at 9, tbl. SIR-1; SIR_13E_000008.)

Of course, these metrics may not be perfectly applicable in the wilderness context. If one is standing at Royal Lake in winter, hearing nothing more than a whisper, the sound of moderate rainfall or a wooded residential neighborhood would change the experience at that lake, to be sure.  It would not be as jarring as the sound of power tools,

---

[12] The SIR also describes a 5.5 dBA increase as a "doubling in annoyance," but at the same time points out that this metric is less applicable to areas of short-term use such as wilderness.  (SIR at 14; SIR_13E_000013.)

or construction, or traffic.   But it would change the wilderness visitor's experience nonetheless.   Indeed, if a 10 dBA increase amounts to a doubling of sound, a 27 dBA increase would amount to an almost **eight-fold** increase in sound at Royal Lake.  (SIR at 14; SIR_13E_000013.)   And if a 5.5 dBA increase in noise constitutes a "doubling in annoyance," the impact would be even greater.  (SIR at 14; SIR_13E_000013.)

Still, it is necessary to take into account other facts to understand fully how much Alternative 2 will increase sound in the BWCAW and whether, consequently, Alternative 2 would violate the Wilderness Act.  It is important to note, for example, that Royal Lake is only a portion of the area that would see increased noise – specifically increased noise above the natural ambient level – due to Alternative 2, much less of the entire project area of over 7,400 acres.  (SIR at 13; SIR_13E_000012.)  The impact of Alternative 2 on the rest of the BWCAW that borders the new trail is relatively minor. (*Id.*)  Indeed, the increase in sound at the Royal River area is only 2 dBA more than the increase in sound over natural ambient levels under the no-action alternative.[13] Moreover, certain portions of the BWCAW around North Fowl and Little John lakes already exceed 50 dBA.  (SIR at 16, tbl. SIR-3; SIR_13E_000015; *see also* SIR app. A at 38, fig. A-6; SIR_13E-000037.)

---

[13] This analysis is different than examining how much territory the agency action impacts in general (i.e., the next factor, discussed below).  Instead, in assessing the increase in sound caused by the agency action, the Court must also acknowledge that the sound impact is not constant throughout the affected area.  While it is significant in one portion of the affected area, it is insignificant in the remainder of the affected area.

Thus, although the increase in sound at Royal Lake is not insignificant, it is not sufficient alone to establish that the Forest Service's determination that the change in sound is "small in scope," (SIR at 15; SIR_13E_000014), amounts to arbitrary and capricious action that violates the Wilderness Act.  It is still necessary, however, to consider the other ways in which the audible sound in the BWCAW project area is changing.

### 2.   Type/Quality and Geographic Scope of the Snowmobile Noise

As for the type of sound heard in the wilderness portion of the project area, the SIR found that "snowmobiles are currently heard throughout the project area under all alternatives," including the no-action alternative.   (SIR at 8; SIR_13E_000007).  However, 65 acres (0.9% of the impacted wilderness area) would experience sound levels **above natural ambient sound** for the first time.   (SIR at 10, 16; SIR_13E_000009, SIR_13E_000015.)  It concluded that this difference "is very small when the project area is considered."  (SIR at 16; SIR_13E_000015.)

The plaintiffs dispute the finding that 65 acres of wilderness is too small to constitute a violation and claim that snowmobile noise is not currently audible near portions of the Royal River.   (SIR at 13; SIR_13E_000012.)   They argue that the Wilderness Act does not include exceptions for changes that degrade the wilderness character in small areas only, or that do not affect human visitors.   As the SIR notes, however, snowmobile sound is already audible in the 65 acres in question, only at a **loudness** below the natural ambient level.    (SIR at 7-8; SIR_13E_000006-

SIR_13E_000007.)  And because the sound of snowmobiles is of a different type than the sounds of nature, it may still be audible even if quieter than natural ambient.  (SIR at 7-8; SIR_13E_000006-SIR_13E_000007 ("[Audible sound r]efers to any sound discernible to the human ear.  A source sound level may be lower than the ambient sound level, yet still be heard or audible since the sound is of a different type.").)

Sound "of a different quality" may degrade the wilderness character of an area. *Izaak Walton League*, 516 F. Supp. 2d at 990.  But, given that snowmobile sound already reaches the entire portion of the BWCAW at issue, the plaintiffs cannot demonstrate that Alternative 2 introduces sound of a different quality.  (*See* SIR app. A at 26; SIR_13E-000025.)  Indeed, part of the impact of the SIR's NPS report and model, which found lower natural ambient sound levels throughout the BWCAW, is that since nature is quieter than expected, the existing sounds of snowmobiles – and the sounds of snowmobiles under Alternatives 2-4 – reach farther than expected under the FEIS.  (SIR at 12; SIR_13E_000011.)  As a result, in light of the SIR, it is even more difficult for the plaintiffs to assert, credibly, that Alternative 2 introduces sound "of a different quality" into the affected portion of the BWCAW.

### 3.  Duration and Frequency of the Noise

The National Park Service concurred with the FEIS's conclusion that the frequency of snowmobile use will remain the same regardless of the chosen alternative. (FEIS at 26; AR_000970; SIR at 8-9; SIR_13E_000007-SIR_13E_000008.)  However, the duration of time that snowmobile sound is audible in the wilderness is expected to

increase slightly.  At the points of greatest impact, snowmobile sound is above natural ambient levels for .7% of the week now, and is projected to be above the natural ambient sound level for 4.8% of the week under Alternative 2.  (SIR at 17; SIR_13E_000016.) The SIR describes this heightened frequency as still being "a very small portion of the week." (SIR at 17; SIR_13E_000016.)  The noise will be audible, whether above natural ambient levels or not, for 6.4% of the week, or 10 hours and 48 minutes out of the entire week under Alternative 2, and 1% of the week, or 1.7 hours, under the no-action alternative.[14]  (SIR at 17; SIR_13E_000016.)

The plaintiffs argue that according to the FEIS, snowmobile traffic would largely occur on Friday, Saturday, and Sunday.  (SIR at 8; SIR_13E_000007 (quoting FEIS estimate of "25 to 30 sleds [on the current trail] for three days per week").)  Considering these three days of the week alone, the plaintiffs estimate sound would be heard 22.5% of the time (3 hours and 36 minutes per day) from the hours of 7:00 am to 11:00 pm under Alternative 2, whereas sound would be heard 3.5% of that same time period (34 minutes per day) under the no-action alternative.  (Pls.' Mem. at 30.)

By focusing on percentages, the plaintiffs exaggerate the difference between their analysis and the SIR's.  It is true that the most traffic on Alternative 2 might occur on

---

[14] The plaintiffs allege that the SIR only analyzed the impacts along the loudest portions of the trail, but the SIR states otherwise.  The SIR explains that the NPS "identif[ied] the minutes [that] a snowmobile running the entire Alternative route [would] be audible or above ambient at any given location in the modeling area," and then the location with the greatest duration was selected for the purpose of multiplying the noise by the frequency of snowmobile use.  (SIR app. A at 39.)  Thus, the NPS did account for the impact along the entire route, but chose to analyze the maximum impact, which would also be the most significant impact.

Friday, Saturday, and Sunday.  (SIR at 8; SIR_13E_000007.)  But, as the Forest Service correctly notes, the opportunity for solitude exists twenty-four hours a day, seven days a week.  Given that the Wilderness Act protects the opportunity for solitude, *see* 16 U.S.C. §§ 1331(a), (c) (defining wilderness as land protected so that it has "outstanding opportunities for solitude"), the Forest Service was not arbitrary and capricious to analyze the duration of sound across the entirety of the week, instead of simply portions of the week.  Indeed, to do otherwise would mean ignoring the wilderness, and the effects or lack thereof of agency activity on it, for significant portions of each week.

The plaintiffs' argument is focused on the impact of increased snowmobile sound on wilderness visitors.  Recreationists may be more likely to visit the wilderness on the weekends.  If that is true, it is possible that the weekend would be the only time there is **any** sound impact on humans.  But the Royal Lake and Royal River area, where the impacts of Alternative 2 are the greatest, is virtually unvisited during the winter.  (FEIS at 24; AR_000968.)  Indeed, the record shows that Royal Lake is difficult to reach at the time of year when snowmobiles will be in use.  (ROD at 31; AR_001434.)  Therefore, the practical effect on wilderness visitors during the entire winter is minimal at most.

But regardless of whether visitors are present, the addition of either one or three hours per day is not enough to constitute a Wilderness Act violation when considered together with the other factors discussed above.  During this entire length of time, the sound's volume will not exceed the level of moderate rainfall, and snowmobile sound is not new to the area.  The fact that the length of time these effects are experienced could

increase by as much as three hours per day for three days out of the week is not sufficient to establish that the Forest Service's decision was arbitrary and capricious.

### D.     Conclusion[15]

Taking into account all of the factors discussed above, the Forest Service's conclusion that "opportunities for solitude are substantially unchanged by [the] alternative" was not arbitrary and capricious.  (*See* SIR at 18 (internal quotation marks omitted); SIR_13E_000017.)  Alternative 2 will not introduce a new type of sound to the wilderness.  While Alternative 2 will increase the volume and duration of sound heard at Royal Lake and Royal River, these increases are not significant enough to constitute a Wilderness Act violation.  Ultimately, the most any wilderness visitor will hear due to Alternative 2 is sound equivalent to moderate rainfall.  More importantly, that impact will only occur in a small portion of the affected wilderness.  Indeed, in an area that has been surrounded by snowmobile and other motorized traffic since the time it was designated as

---

[15] The plaintiffs also briefly argue that the cumulative effects of Alternative 2 render the selection of that route arbitrary and capricious.  In making this argument, the plaintiffs cite the various auditory impacts of Alternative 2 discussed above.  (Pls.' Mem. at 32-33.)  But this argument misses the point of a cumulative effects analysis.  Under 36 C.F.R. § 220.4(f), in conjunction with 40 C.F.R. § 1508.7, the cumulative effects analysis requires an examination of cumulative impact; the impact which results not just from the action at issue, but "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes" them.  40 C.F.R. § 1508.7; s*ee also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769-70 (2004) (quoting 40 C.F.R. § 1508.7); *Kleppe v. Sierra Club*, 427 U.S. 390, 409-10 (1976); NEPA Law and Litig. § 10:42 (2d 2014) ("In a typical case, the cumulative effects problem occurs when an agency proposes a project and there are other similar projects in the area outside the project that have similar environmental effects.").  The Forest Service included a cumulative effects analysis in its FEIS.  (FEIS at 16; AR_000960; *see also* DEIS at 2; AR_000481.)  The plaintiffs have not shown that this cumulative effects analysis was arbitrary and capricious.

wilderness, where there are few winter visitors and the expectation of solitude is slim, Alternative 2 does not amount to an impermissible degradation of the area's wilderness character. *See Izaak Walton*, 516 F. Supp. 2d at 989-90; *see also Vermonters for a Clean Env't, Inc.*, 2014 WL 7366061, at *14. While the issue is a close one, the plaintiffs have failed to demonstrate that the increase in snowmobile sounds under Alternative 2 is significant enough to constitute a violation of the Wilderness Act. Therefore, the Court will grant the Forest Service's and intervenors' motion for summary judgment on the Wilderness Act claim, and deny the plaintiffs' motion.

## V.    NEPA CLAIM

### A.    NEPA's EIS Requirements

NEPA requires federal agencies to prepare an EIS for, or otherwise analyze the environmental impact of, all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This Court previously ordered the Forest Service to conduct an EIS on the sound impacts of the South Fowl Snowmobile Trail on the BWCAW. *Izaak Walton League*, 516 F. Supp. 2d at 997. As the Forest Service notes, NEPA's EIS requirements have two key aims: providing policymakers with detailed information regarding environmental impacts and guaranteeing that that information will reach the public, allowing citizens to play a role in the decision-making process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA requires a "hard look at the environmental consequences of a project before taking a major action." *Friends of Boundary Waters Wilderness*, 164 F.3d at 1128 (internal

quotation marks omitted).   An agency shows adequate consideration of those consequences "through the EIS's form, content, and preparation."  *Id.*  The role of this Court is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id.* (internal quotation marks omitted).   Courts should not "fly speck an EIS for inconsequential or technical deficiencies."  *Id.* (internal quotation marks omitted).

The Eighth Circuit has noted that an agency need not provide a new or supplemental EIS "every time new information comes to light" because to require as much "would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1104 (8th Cir. 2005) (internal quotation marks omitted).   Nevertheless, NEPA's implementing regulations require the environmental analysis to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14; 36 C.F.R. § 220.5(e) ("The EIS shall document the examination of reasonable alternatives to the proposed action.")  The agency must identify its "preferred alternative or alternatives, if one or more exists, in the draft statement and . . . final statement."  40 C.F.R. § 1502.14(e).

**B.     Adaptive Management Strategy and the Forest Service's EIS**

The Forest Service's regulations define adaptive management as:

A system of management practices based on clearly identified intended outcomes and monitoring to determine if management actions are meeting those outcomes; and, if not, to facilitate management changes that will best ensure that those outcomes are met or re-evaluated.  Adaptive management stems from the recognition that knowledge about natural resource systems is sometimes uncertain.

36 C.F.R. § 220.3; *see also In re Operation of the Mo. River Sys. Litig.*, 363 F. Supp. 2d 1145, 1163 (D. Minn. 2004) ("Adaptive management is an approach to natural resources management, in which policy choices are made incrementally.  As each choice is made, data on the effects of these choices are collected and analyzed in order to assess whether to retain, reverse, or otherwise alter the policy choice."), *aff'd in part, vacated in part on other grounds*, 421 F.3d 618 (8th Cir. 2005).  *See generally* J.B. Ruhl & Robert L. Fischman, *Adaptive Management in the Courts*, 95 Minn. L. Rev. 424, 428-42 (2010) (discussing the history of adaptive management, including the theory underlying it and its use by government agencies, and defining it, generally, as "expert agencies exercising professional judgment through an iterative decisionmaking process emphasizing definition of goals, description of policy decision models, active experimentation with monitoring of conditions, and adjustment of implementation decisions as suggested by performance results").

The plaintiffs contend that the Forest Service's hybrid approach – which employs either one snowmobile trail (Alternative 2) or another (Alternative 4) – does not actually constitute the incremental approach that normally defines adaptive management.  They

argue that the failure to separately publicize or analyze this approach in the DEIS and FEIS violates NEPA per se and deprives the public of the chance to comment on this hybrid approach.  They also claim the adaptive management strategy is substantively deficient.

### 1.     Failure to Include Adaptive Management Strategy in the EIS

#### a.     NEPA's Requirements

NEPA's implementing regulations state that, in an EIS, a proposed agency action "and one or more alternatives to the proposed action may include adaptive management." 36 C.F.R. § 220.5(e)(2).  Such a proposal "**must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects**."  *Id.* (emphasis added).  "The EIS must disclose not only the effect of the proposed action or alternative but also the effect of the adjustment.  Such proposal or alternative must also describe the monitoring that would take place to inform the responsible official during implementation whether the action is having its intended effect."  *Id.*  The Forest Service Handbook contains similar language and cites to the same C.F.R. provision.  (Marttila Aff., Ex. L (Forest Service Handbook) at 44 (FSH 1909.15 § 14.1), July 1, 2014, Docket No. 157-12; SIR_13F_000055.)  Furthermore, as noted above, one of NEPA's goals, in general, is to give the public the chance to comment on a proposed agency action.  *Robertson*, 490 U.S. at 349.

Although the Forest Service claims that "all aspects of the decision were fully disclosed and analyzed," it is not clear where the Forest Service disclosed its adaptive management approach in the DEIS or FEIS.  (Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Mem.") at 59, Aug. 15, 2014, Docket No. 163.)  In the alternative, the Forest Service contends that while 36 C.F.R. § 220.5(e)(2) allows for the Forest Service to propose an adaptive management strategy as a stand-alone alternative in an EIS, it does not require it.  Given the language of the regulation – which lays out the type of disclosure the Forest Service must provide when it includes adaptive management in an EIS – and NEPA's general goal of providing the public and policymakers with significant and relevant information about proposed action alternatives, *Robertson*, 490 U.S. at 349, it is unlikely that the Forest Service's interpretation of the regulation is correct.  Instead, the text of the regulation more plainly means that if the agency is considering an adaptive management approach, it should disclose it in its EIS.  Indeed, the intervenors concede that the Forest Service did not adhere to the letter of Section 220.5(e)(2), but argue instead that the error was harmless. (Intervenors' Mem. at 42 n.16, 54-57.)  Assuming, without deciding, that the Forest Service violated NEPA by not including its adaptive management strategy as a separate alternative in its EIS, the Court will consider next the intervenors' harmless error argument.

### b.        Harmless Error

Courts reviewing administrative action that violates agency regulations may uphold that action if the error is harmless.  *Nevada v. DOE*, 457 F.3d 78, 90 (D.C. Cir. 2006); *see also Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) ("The harmless error rule applies to agency action because if the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." (internal quotation marks omitted)).  Courts have applied this harmless error rule "in the NEPA context where the proposing agency engaged in significant environmental analysis before reaching a decision but failed to comply precisely with NEPA procedures."  *Nevada*, 457 F.3d at 90.  In *Nevada*, the D.C. Circuit upheld agency action under the harmless error rule where the agency had failed to indicate in an EIS which alternative was its preferred alternative.  *Id.* ("The many comments submitted in response to the FEIS manifest that the public had sufficient information to comment on the five corridors . . . [that] the [agency] evaluated in the FEIS.")

This case is similar to, if somewhat different than, *Nevada*.  On one hand, the Forest Service in this case could be seen as leaving out of the DEIS and FEIS more than its preferred option among various alternatives, as in *Nevada*.  Instead, it left out a hybrid approach that uses two different snowmobile routes.  And while both of those alternatives

were considered in detail, the conditions that would trigger a switch from one alternative to another were not.[16]

On the other hand, both alternatives ultimately adopted in the ROD were analyzed thoroughly in the DEIS and FEIS, along with the monitoring plan the Forest Service would use to track the first-choice route.  All that was missing was the triggering conditions, which closely track the monitoring objectives and measures.  (*Compare* FEIS at 105; AR_001049, *with* ROD at 18-19; AR_001421-AR_001422.)  In other words, very little relevant information was missing from the DEIS and FEIS.  Like in *Nevada*, while the outcome might have been slightly different – in *Nevada*, more comments on the preferred option might have led to its alteration or rejection, while here better-informed comments might have led to the selection of slightly different triggering conditions – the amount of analysis that was done and breadth of information on which the public had the opportunity to comment make it likely that the error had no practical effect.  *Id.* at 90.

Indeed, it is important to note that the Forest Service did present and analyze a significant amount of information about all four alternatives, in both the DEIS and FEIS. The information presented is in keeping with the twin goals of the EIS process – providing information to policymakers regarding environmental impacts and guaranteeing that sufficient information reaches the public.  *Robertson*, 490 U.S. at 349. While the specific triggering conditions were not disclosed, policymakers and the public

---

[16] Although the Court will ultimately conclude that the Forest Service did not violate NEPA, the Forest Service should consider taking into account public input on the conditions that would trigger a change from Alternative 2 to Alternative 4, before or while implementing the South Fowl Snowmobile Trail.

did receive detailed information on both of the relatively simple options eventually adopted in the adaptive management plan. In a more complex case, on the other hand, the adaptive management strategy might give policymakers the discretion to make more nuanced and complicated changes based on shifting conditions, and the DEIS and FEIS might consequently not be able to analyze thoroughly the varied policy options available.

For example, in *Western Watersheds Project v. Salazar*, the court considered adaptive management adjustments to the Interagency Bison Management Plan ("IBMP"), a complex plan that involves controlling the movement and numbers of the bison population in the Yellowstone National Park area, and that seeks to limit the risk of bison contracting brucellosis. 766 F. Supp. 2d 1095, 1105-06 (D. Mont. 2011). Years after the initial IBMP was adopted, the relevant agencies adopted numerous adaptive management measures – which allowed for additional hazing, hunting, movement, and quarantine of bison – based on new data and experience implementing the IBMP. *Id.* at 1110-11. The court concluded that these changes were "within the framework of the IBMP" and, consequently, supplemental NEPA analysis was not required. *Id.* (internal quotation marks omitted).

Of course, the procedural posture of *Western Watersheds Project* is different than in this case. But the case is still relevant to show how varied and complex the policy options in an adaptive management strategy can be, and how difficult it can be in other cases for an EIS to describe and analyze all of those options. This case involves a far smaller and less complex set of policy options than in *Western Watersheds Project*, all of which were disclosed and analyzed in the DEIS and FEIS. As a result, the Forest

Service's EIS process, while imperfect, was able to give policymakers and the public the most critical information on all of the policy choices that would eventually make up the adaptive management strategy adopted in the ROD.  The Forest Service's adoption of an adaptive management approach in the ROD – utilizing alternatives fully considered in the DEIS and FEIS – was therefore well within the scope of the Forest Service's initial environmental analysis.  *See, e.g.*, NEPA Law & Litig. § 7:13.20 (2d 2014) ("The [Council on Environmental Quality's ("CEQ") NEPA] Task Force takes the position that **any adaptive measures that exceed the limits of the original analysis** would trigger the supplemental statement requirement of the CEQ regulations and require additional NEPA review." (emphasis added) (internal quotation marks omitted)).  Indeed, part of what makes this case unique is that, unlike in other cases, where an agency mentioned adaptive management in an EIS but did not analyze fully and exhaustively the policy options that policymakers could choose from if triggering conditions were met, this case involves one policy choice, and a backup policy choice, that have been fully and thoroughly commented on and analyzed.

Finally, although not dispositive in the NEPA-compliance analysis, the Court notes that the adaptive management approach is better for the plaintiffs than selecting Alternative 2 alone with no means of quickly changing to a less invasive route. Maintaining Alternative 4 as a backup route ensures that, if Alternative 2 has a more significant impact on the BWCAW than initially projected, the Forest Service can quickly pivot to an alternative that is quieter and well-known – a safer variation on the exact route the Forest Service is using now.  In sum, while the Forest Service should have

analyzed its adaptive management strategy in its DEIS and FEIS, its failure to do so was harmless error.

### 2.      Substantive Quality of the Adaptive Management Strategy

The plaintiffs also challenge the adaptive management strategy substantively. They argue that the Forest Service's hybrid approach is not actually an adaptive management strategy, since it does not introduce any incremental changes.  They also contend that the ROD's conditions, which would trigger a change from Alternative 2 to 4, are impermissibly vague. S*ee Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1029 (9th Cir. 2011) (rejecting an adaptive management strategy that allowed for the delisting of an endangered species with the caveat that it could be "relisted if . . . threatened," because a valid plan would require "more specific management responses, tied to more specific triggering criteria").  (*See generally* ROD at 18-19; AR_001421-AR_001422 (listing conditions that would trigger a switch from Alternative 2 to 4).)

The plaintiffs also challenge the monitoring plan provided in the ROD.[17]  Noting that 36 C.F.R. § 220.5(e)(2) requires an agency to disclose the monitoring plan that it would use when implementing an alternative management strategy, the plaintiffs argue this monitoring plan is not tied in any logical or sensible way to the conditions it is supposed to monitor.  Indeed, the monitoring plan is drawn verbatim from the FEIS, which predated the adaptive management strategy in the ROD.  (*Compare* FEIS at 105;

---

[17] Because the Court rejects the plaintiffs' argument that the ROD's monitoring plan is substantively deficient, it will not consider the Forest Service's contention that the argument is waived because the plaintiffs did not raise it in their administrative appeal.

AR_001049, *with* ROD at 21; AR_001424.)   Thus, the plaintiffs argue, the monitoring plan was not designed with the adaptive management strategy and its conditions in mind. Finally, the plaintiffs argue that the conditions give the Forest Service unlimited and impermissible discretion in deciding whether to adopt an adaptive management strategy, *see NRDC v. Kempthorne*, 506 F. Supp. 2d 322, 352 (E.D. Cal. 2007) (rejecting an adaptive management strategy that did not require that any actions be taken), and that such a strategy is bad policy.

The Court concludes that the hybrid approach in the Forest Service's ROD was not arbitrary or capricious: the hybrid approach **does** constitute an adaptive management strategy and that strategy is substantively sufficient.   The plaintiffs do not cite any authority that requires an alternative management strategy to be incremental.   In fact, at least one source the plaintiffs cite says the opposite.  (*See* Marttila Aff., Ex. K (George H. Stankey et al., U.S. Dep't of Agric., Gen. Technical Report No. PNW-GTR-654, *Adaptive Management of Natural Resources: Theory, Concepts, and Management Institutions* (Aug. 2005)) at 16-18 (discussing various alternative models of adaptive management, including "incremental adaptive management").)   Such a strategy **may** be more incremental or nuanced, but this case is a straightforward and simple one that allows for a rather basic approach: one snowmobile trail and, if it does not work, another. Indeed, the Forest Service's approach in this case fits within the definition of "adaptive management" found in the Forest Service's regulations.   *See* 36 C.F.R. § 220.3 (defining adaptive management as an approach to government action that allows for an agency to

change its management practices if those practices are failing to meet certain outcomes and objectives).

While the adaptive management strategy's conditions and monitoring plan could be more detailed, the level of detail provided was not arbitrary and capricious, especially given how simple this case is. *See Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Dir. 2010) (upholding an adaptive management strategy even though it did not contain "detailed, unchangeable mitigation plans"; stating that the agency was justified in monitoring the plan's effects and adapting mitigation measures in response to those effects; and stating that "adaptable mitigation measures [are] a responsible decision in light of the inherent uncertainty of environmental impacts"). For example, this case is significantly different than one involving policy choices as complex as the removal of the grizzly bear from a threatened species list. *See Greater Yellowstone Coal, Inc.*, 665 F.3d at 1028-29. That case involved a plan to delist the grizzly, justified in large part by an adaptive management strategy that would allow the U.S. Fish and Wildlife Service to relist the grizzly if certain conditions were met. *Id.* at 1028. The plan was general and vague, stating that if decreases in common grizzly food occurred and led to increases in grizzly mortality, and if that increase in mortality "threaten[ed] the grizzly population, the [agency's] Study Team would recommend appropriate management responses" or consider relisting the grizzly. *Id.* at 1029. The court rejected the adaptive management approach, stating that "more specific management responses, tied to more specific triggering criteria, are required." *Id.*

This case is significantly less complex than *Greater Yellowstone Coalition*, while the Forest Service's adaptive management strategy is nevertheless more detailed. This case involves two basic snowmobile route alternatives (Alternatives 2 and 4), both of which have been studied in significant detail. The plan selected chooses the Forest Service's preferred alternative, Alternative 2, but, recognizing that Alternative 2 may lead to more incursions into the BWCAW, keeps Alternative 4 as a secondary option. (ROD at 16-20; AR_001419-AR_001423.) The conditions provide more detail than the conditions in cases like *Greater Yellowstone Coalition*. The ROD notes that the Forest Service will close Alternative 2 and open Alternative 4 if the Forest Service and other government entities wish to connect the area to other state trails; if the Forest Service is unable to keep OHVs off Alternative 2; if illegal incursions from Alternative 2 into the BWCAW start occurring; or if the snowmobile use of Alternative 2 exceeds the route's capacity. (ROD at 18; AR_001421.)

Although the conditions could be more specific in the sense that they could include specific numeric targets that would trigger agency action (e.g., if two illegal incursions into the BWCAW occur, Alternative 2 will be shut down), the plaintiffs cite no source that requires that level of specificity. While the plaintiffs do cite to *Greater Yellowstone Coalition*, it is clear that the conditions in this case, while imperfect, offer policymakers and the public far more detail regarding what will trigger agency action. *See* 665 F.3d at 1029.

Additionally, to the extent the plaintiffs contend that these conditions offer the Forest Service unlimited discretion, they ignore the fact that the ROD's conditions do

provide sufficient detail to force agency action. If snowmobiles start getting stuck on Alternative 2 due to heavy traffic, or if members of the public see OHVs on the trail, or if a pattern of illegal incursions into the BWCAW is apparent, the Forest Service would need to close the northern route and open Alternative 2. (*See, e.g.*, ROD at 18; AR_001421 ("If the Forest Service has determined that all reasonable attempts to close the north route to OHVs are not effective, the trail **will** be closed and Alternative 4 constructed . . ." (emphasis added)).)

The plaintiffs also cite *NRDC v. Kempthorne* for the proposition that an adaptive management strategy that offers policymakers unfettered discretion, and does not require any action be taken if conditions are triggered, is invalid. 506 F. Supp. 2d at 352-56 ("Here, the adaptive management process has no quantified objectives or required mitigation measures. Although the [adaptive management] **process** must be implemented by holding meetings and making recommendations, nothing requires that any **actions** ever be taken.") But the corrective measures in that case were considerably more complex than in this case, and provide the relevant agencies significantly more discretion. Indeed, if triggering conditions were met, a working group of state and federal government agencies would be convened, which would then consider taking certain actions and recommend those actions to a different management team. *Id.* at 341. As the court noted, nothing in that process required the working group to make recommendations. *Id.* at 352. Similarly, nothing in the adaptive management scheme dictated when the management team would need to act on the working group's recommendations. *Id.* In this case, the triggering conditions are more concrete and there

are far fewer barriers between triggering conditions and agency action. As a result, *NRDC* provides little support for the plaintiffs' argument. In sum, the ROD's triggering conditions are not so vague, and do not provide so much discretion, as to render them arbitrary and capricious.

The Court also concludes that the monitoring plan is not arbitrary and capricious. The key question is whether the monitoring plan corresponds with the triggering conditions that would lead to a change in management practices. *See* 36 C.F.R. § 220.5. While the plaintiffs do point out some discrepancies between the monitoring plan and the adaptive management strategy (e.g., one objective in the monitoring conditions is to bar "illegal motorized trail use," while the triggering conditions seem to allow for some illegal incursions into the BWCAW), (*see* ROD at 18, 21; AR_001421, AR_001424), the plaintiffs ask for more specificity and detail than the law requires. The monitoring plan does provide sufficient monitoring methods – namely regular field checks – to gather information on the types of problems (e.g., overuse of Alternative 2 and illegal trail use) that would trigger the adaptive management strategy's conditions and call for a change to Alternative 4.

Finally, the Court rejects the plaintiffs' contention that the Forest Service's approach is bad policy. First of all, as noted above, it is not clear why the adaptive management strategy adopted by the Forest Service would be inferior to the Forest Service adopting Alternative 2 alone; the latter approach would leave the Forest Service with no readily available alternative if Alternative 2 proves problematic. Moreover, it is not this Court's role to engage in a protracted policy debate with a government agency.

Instead, this Court's role is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Friends of Boundary Waters Wilderness*, 164 F.3d at 1128. In sum, the Court concludes that, as to the plaintiffs' NEPA claim, the Forest Service's actions were not arbitrary and capricious.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment [Docket No. 154] is **DENIED**.

2. The defendants' Cross-Motion for Summary Judgment [Docket No. 162] and the intervenors' Motion for Summary Judgment [Docket No. 159] are **GRANTED.**

3. Plaintiffs' Wilderness Act and NEPA claims are **DISMISSED with prejudice**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  February 13, 2015
at Minneapolis, Minnesota.

s/ John H. Tunheim

JOHN R. TUNHEIM
United States District Judge